**In re FACEBOOK, INC., IPO SECURITIES AND DERIVATIVE LITIGATION.**

MDL No. 12–2389.

United States District Court,
S.D. New York.

Dec. 12, 2013.

Opinion Denying Motion to Certify Appeal Feb. 14, 2014.

Entwistle & Cappucci LLP, by: Vincent R. Cappucci, Esq., Jordan A. Cortez, Esq., Evan T. Raciti, Esq., Marc X. LoPresti,

Esq., New York, NY, for the NASDAQ Securities Actions.

Finkelstein Thompson LLP, by: Michael G. McLellan, Esq., Douglas G. Thompson, Jr., Esq., Washington, DC, Lovell Stewart Halebian Jacobson LLP, by: Christopher Lovell, Esq., Victor E. Stewart, Esq., New York, NY, Goldberg, Finnegan & Mester, LLC, by: Kevin I. Goldberg, Esq., Silver Spring, MA, Miller Law LLC, by: Marvin A. Miller, Esq., Andrew Szot, Esq., Chicago, IL, DiTommaso Lubin, Oakbrook Terrace, IL, by: Vincent DiTommaso, Gainey McKenna & Egleston, by: Thomas J. McKenna, Esq., Gregory D. Egleston, Esq., New York, NY, Stamell & Schager, LLP, by: Chard J. Schager, Jr., Esq., Andrew R. Goldenberg, Esq., New York, NY, for the NASDAQ Negligence Parties.

Ballard Spahr LLP, by: William A. Slaughter, Esq., Paul Lantieri, III, Esq., Stephen J. Kastenberg, Esq., Philadelphia, PA, for NASDAQ Defendants.

### OPINION & ORDER

SWEET, District Judge.

Pursuant to the transfer order from the United States Judicial Panel on Multidistrict Litigation (the "MDL Panel"), entered on October 4, 2012, 41 actions stemming from the May 18, 2012 initial public offering ("IPO") of Facebook, Inc. ("Facebook") are presently before this Court.

The instant motions relate to the class actions against the NASDAQ Stock Market LLC (the "Exchange"), its parent, the NASDAQ OMX Group, Inc. ("NASDAQ OMX," and collectively with the Exchange, "NASDAQ"), Robert Greifeld, NASDAQ OMX's Chief Executive Officer ("Greifeld"), and Anna M. Ewing, NASDAQ OMX's highest-ranking technology officer ("Ewing") (collectively, "Defendants") alleging federal securities (the "NASDAQ Securities Actions") and negligence claims (the "NASDAQ Negligence Actions") (collectively, the "NASDAQ Actions[1]") brought by First New York Securities LLC, T3 Trading Group, LLC and Avatar Securities, LLC (collectively, the "Securities Plaintiffs") and the Negligence Plaintiffs (collectively with the Securities Plaintiffs, the "NASDAQ Claimant Group" or "Plaintiffs").

Plaintiffs move for an order partially lifting the discovery stay imposed under Section 21D(b)(3)(B) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4(b)(3)(B) (the "PSLRA"), and for leave to amend the Consolidated Amended Class Action Complaint ("CAC"). Defendants, in turn, move to dismiss the CAC pursuant to F.R.C.P. 12(b)(6).

For the reasons set forth below, (1) Defendants' motion to dismiss is granted in part and denied in part; (2) Plaintiffs' motion to lift the stay is rendered moot;

---

[1]. The NASDAQ Actions include: *First New York Securities, LLC, et al. v. NASDAQ OMX Group, Inc. et al.*, No. 12–cv–5630 (filed 7/23/12); *Goldberg v. NASDAQ OMX Group, Inc., et al.*, No. 12–CV–4054 (filed 5/22/12); *Yan v. NASDAQ OMX Group, Inc., et al.*, No. 12–cv–420Q (filed 5/25/12); *Alfonso v. The NASDAQ Stock Market LLC, et al.*, No. 12–cv–4201 (filed 5/25/12); *Levy v. The NASDAQ Stock Marker LLC, et al.*, No. 12–cv–4315 (filed 6/1/12); *Amin v. The NASDAQ Stock Market LLC, et al.*, No. 12–cv–4403 (filed 6/5/12); *Steinman v. NASDAQ OMX Group, et al.*, No. 12–cv–4600 (filed 6/12/12); *Roderick v. NASDAQ OMX Group, et al.*, No. 12–cv–4716 (filed 6/15/12); *McGinty v. NASDAQ OMX Group, Inc., et al.*, No. 12–cv–5549 (filed 6/19/12); and *Eagan v. NASDAQ OMX Group, Inc., et al.*, No. 12–cv–6882 (filed 9/11/12), and the NASDAQ Negligence Parties consist of all plaintiffs in those actions.

and (3) Plaintiff's motion to amend is granted in part and denied in part.

### Prior Proceedings

On September 20, 2012, the MDL Panel held a hearing to determine whether the pending 41 filed actions should be transferred to the Southern District of New York. On October 4, 2012, the MDL Panel issued a transfer order, finding that the "Southern District of New York is an appropriate transferee district for pretrial proceedings in this litigation," reasoning that "[m]uch of the relevant discovery will be located in New York, including most discovery relating to alleged NASDAQ trading errors and discovery from the underwriter defendants, many of whom are located in New York." *In re Facebook, IPO Secs. & Derivative Litig.*, 899 F.Supp.2d 1374, 1376–77 (Jud.Pan. Mult.Lit.2012). The cases were assigned to this Court for coordination or consolidation of the pretrial proceedings. *Id.*

On October 10, 2012, this Court issued a *Practice & Procedure Order Upon Transfer Pursuant to 28 U.S.C. § 1407* (the "October 10 Order"), governing the practices and procedures for the 41 related actions filed against the Facebook Defendants, NASDAQ, and certain underwriter defendants, including the three lead underwriters of the IPO, Morgan Stanley & Co. LLC ("Morgan Stanley"), J.P. Morgan Securities, LLC ("JP Morgan"), and Goldman, Sachs & Co. ("Goldman Sachs") (collectively, the "Underwriter Defendants").[2]

The October 10 Order outlined the "Organization, Designation and Responsibilities of Counsel" and set forth the procedures to "designate lead counsel by October 31, 2012, subject to the approval of the Court." (October 10 Order § VII(B).) The October 10 Order also outlined certain procedures "[i]n the event that counsel for each group of parties whose interests are similarly aligned cannot successfully designate lead counsel." (*Id.* § VII(B)(ii).)

Several parties, representing various interests of class members, filed competing motions for appointment of lead plaintiff and designation of lead counsel. According to the parties, extensive discussions took place with the various lead plaintiff movants and substantial progress toward agreement upon designation was made. On August 3, 2012, the NASDAQ Securities Plaintiffs filed a motion seeking the (1) consolidation of all NASDAQ actions, (2) their appointment as lead plaintiff pursuant to the PSLRA and (3) the approval of Entwistle & Cappucci LLP ("Entwistle & Cappucci") as lead counsel for the class. On November 5, 2012, the NASDAQ Negligence Parties filed a brief seeking the designation of Finkelstein Thompson LLP ("Finkelstein Thompson") and Lovell Stewart Halebian Jacobson LLP ("Lovell Stewart") as interim co-lead class counsel for the NASDAQ Negligence Action.

By order on December 4, 2012 ("the December 4 Order"), this court deter-

---

**2.** The Underwriter Defendants include Morgan Stanley & Co., LLC; J.P. Morgan Securities LLC; Goldman, Sachs & Co.; Merrill Lynch; Pierce, Fenner & Smith Inc.; Barclays Capital Inc.; Allen & Company LLC; Citigroup Global Markets Inc.; Credit Suisse Securities (USA); Deutsche Bank Securities Inc.; RBC Capital Markets, LLC; Wells Fargo Securities, LLC; Blaylock Robert Van LLC; BMO Capital Markets Corp.; C.L. King & Associates, Inc.; Cabrera Capital Markets, LLC; CastleOak Securities, L.P.; Cowen and Company, LLC; E*TRADE Securities LLC; Itau BBA USA Securities, Inc.; Lazard Capital Markets LLC; Lebenthal & Co., LLC; Loop Capital Markets LLC; M.R. Beal & Company; Macquarie Capital (USA) Inc.; Muriel Siebert & Co., Inc.; Oppenheimer & Co. Inc.; Pacific Crest Securities LLC; Piper Jaffray & Co.; Raymond James & Associates, Inc.; Samuel A. Ramirez & Co., Inc.; Stifel, Nicolaus & Co., Inc.; The Williams Capital Group, L.P.; and William Blair & Company, LLC.

mined that the NASDAQ Actions were consolidated, the Securities Plaintiffs were appointed lead plaintiffs in the NASDAQ Actions, and the NASDAQ Negligence Plaintiffs were appointed co-lead plaintiffs in the NASDAQ Negligence Actions. Entwistle & Cappucci was appointed lead counsel for the NASDAQ Securities Actions and Finkelstein Thompson and Lovell Stewart were appointed co-lead counsel for the NASDAQ Negligence Actions. All other motions pending before the Court related to these actions only were denied.

On April 30, 2013, the NASDAQ Claimant Group filed the CAC, alleging damages in excess of $500 million. On May 29, 2013, the U.S. Securities and Exchange Commission (the "SEC" or the "Commission") issued the Cease–and–Desist Order (the "SEC Order[3]") in the administrative proceeding against NASDAQ in connection with the Facebook IPO.

On June 25, 2013, the NASDAQ Claimant Group moved this Court to enter an order partially lifting the discovery stay imposed by the PSLRA to obtain limited discovery consisting of documents and testimony that NASDAQ, and any of their affiliates, parents, subsidiaries, agents and/or employees, provided to the SEC in connection with the SEC's investigation into the May 18, 2012 initial public offering ("IPO") of Facebook, and for leave to subsequently file a Second Consolidated Amended Class Action Complaint ("SCAC") incorporating relevant facts adduced from the requested discovery materials or alternatively from the SEC Order. On July 2, 2013, Defendants filed a motion to dismiss Plaintiffs' negligence and feder-

al securities claims alleged in the CAC. These motions were heard and marked fully submitted on October 3, 2013.

### Allegations of the CAC

Familiarity with the general background of this case is assumed. Certain allegations and facts are repeated in part as relevant to the issues presented by the instant motions and are assumed true as set forth in the CAC.

Facebook is a worldwide social networking company that: (i) builds tools that enable users to connect, share, discover, and communicate with each other; (ii) enables developers to build social applications of Facebook or to integrate their websites with Facebook; and (iii) offers products that enable advertisers and marketers to engage with its users. As of February 2, 2012, Facebook had 845 million monthly users and 443 million daily users.

On February 1, 2012, in preparation for its IPO, Facebook filed a Form S–1 registration statement with the SEC. Facebook subsequently amended the registration statement several times, before filing their final Form S–1/A on May 16, 2012 (the "Registration Statement"). On May 18, 2012, Facebook also filed a Form 424(b)(4) Prospectus (the "Prospectus") with respect to the IPO.

NASDAQ OMX is a global publicly-traded company whose wholly-owned subsidiaries operate securities exchanges around the world. (CAC ¶¶ 63–65.) One of those subsidiaries is the Exchange, or NASDAQ LLC, which operates the NASDAQ Stock Market in the U.S. (CAC ¶ 65.) NASDAQ OMX is not a self-regulated organization

---

**3.** *See The NASDAQ Stock Mkt., LLC & NASDAQ Execution Servs., LLC,* Rel. No. 69,655, 2013 WL 2326683 (May 29, 2013) (the "SEC Order"). The Court takes judicial notice of the SEC Order. *See In re UBS Auction Rate*

*Sec. Litig.,* No. 08 Civ. 2967(LMM), 2010 WL 2541166, at *12 n. 9 (S.D.N.Y. June 10, 2010) (noting that is proper to take judicial notice of SEC materials, including SEC releases).

("SRO"). At all relevant times, Defendants Greifeld and Ewing were officers of NASDAQ OMX, not the Exchange. NASDAQ OMX routinely competes for new listings and overall market share of trading in order to increase revenue and profits. (CAC ¶¶ 63–93.) Specifically, NASDAQ OMX competes against the New York Stock Exchange Euronext ("NYSE"), other exchanges and broker-dealers to secure new listings of securities and to increase its overall market share in trading activity. (*Id.* ¶¶ 66–69.)

The Exchange is an SRO and registered as a national securities exchange under Section 6 of the Exchange Act. *See* 15 U.S.C. §§ 78f & 78c(a)(26); *Findings, Opinion, and Order of the Common, Exch. Act. Rel. No. 53, 128* (Jan. 13, 2006), 71 Fed.Reg. 3,550 (Jan. 23, 2006) ("Exchange Registration Approval Order"). Before it may permit the registration of an exchange as an SRO, the SEC must determine, among other things, that the exchange has a set of rules that are "consistent with the requirements" of the Exchange Act, 15 U.S.C. § 78s(b)(2), and thus that are designed,

> to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest . . . .

15 U.S.C. § 78f(b)(5). In addition, the SEC enforces exchanges' compliance with the Exchange Act, the SEC's rules, and the exchanges' own rules. Thus, the SEC may bring an action to enjoin any activity by an exchange that violates the Exchange Act or any rules promulgated thereunder. 15 U.S.C. § 78u(d). The SEC also may suspend or revoke the registration of an exchange, censure it, or restrict its activities, functions, and operations, *see* 15 U.S.C. § 78s(h)(1), and can remove from office or censure an officer or director of an exchange responsible for such failure. 15 U.S.C. § 78s(h)(4).

On May 18, 2012, Facebook offered 421 million shares of its common stock to the public at $38.00 per share on the NASDAQ stock exchange, thereby valuing the total size of the IPO at more than $16 billion. The IPO was initially set to open at 11:00 a.m. Eastern Standard Time under the NASDAQ ticker symbol "FB," but was delayed. At the end of trading on the day of the initial IPO, Facebook stock closed at $31.00 per share, which was 18.42% below the IPO price.

Shortly thereafter, numerous plaintiffs filed lawsuits throughout the country raising claims about the adequacy of pre-IPO and Class Period disclosures under the federal securities laws, and federal and state claims against NASDAQ for failures relating to the Offering. All of the plaintiffs allege that they suffered some loss as a result of these events, although the causes of action they assert vary.

Claims asserted against NASDAQ were filed on behalf of retail investors who contend that their orders to purchase or sell Facebook stock were not properly executed or confirmed as a result of systems issues experienced by NASDAQ on the day of the Facebook IPO.

The following movants and their proposed counsel are bringing federal securities and negligence claims against NASDAQ:

- The Securities Plaintiffs, represented by Entwistle & Cappucci;

- The Negligence Parties, represented by Finkelstein Thompson and Lovell Steward.

The NASDAQ Securities Actions have alleged federal securities claims against NASDAQ on behalf of a class of purchasers and sellers of Facebook common stock made on NASDAQ on the day of the Facebook IPO, that NASDAQ made material misrepresentations and omissions concerning the capability of its technology and trading platform, which caused substantial damages to the NASDAQ Claimant Group, who collectively traded over 3 million shares at a total value in excess of $316 million on the day of Facebook's IPO.

The NASDAQ Negligence Actions allege state law negligence claims for damages on behalf of retail investors who placed trade orders during Facebook's IPO, based on NASDAQ's flawed design and testing of its software, as well as NASDAQ's decision not to halt trading or cancel impacted trades during the Offering.

### A. *NASDAQ'S Cross Process for Opening Trading after an IPO*

NASDAQ's process for commencing trading in an IPO for a security listed on its Exchange, known as the "IPO Cross," was developed in consultation with market participants and is designed to identify a single price for the opening of trading in a security that is the subject of an IPO. The price is determined based on supply and demand as represented by orders submitted before the execution of the Cross. (CAC ¶ 134; *see also* NASDAQ Rules 4120 & 4753.[4]) The Cross process is governed principally by NASDAQ Rules 4120 and 4753. As this Court has described, each of these rules has an extensive public rule-

making history. *See In re Facebook, Inc., IPO Sec. & Deriv. Litig,* 922 F.Supp.2d 475, 484–85 & 484–85 n. 4 (S.D.N.Y.2013) ("*Zack*") (denying motion to remand); *see also Proposed Rule Change Relating to Initial Quotations of IPOs,* Exch. Act Rel. No. 34,254 (June 24, 1994), 59 Fed.Reg. 33,808 (June 30, 1994). Until trading in a company's security opens on its listing market on the day of its IPO, secondary market trading may not commence on any other market. *See* 17 C.F.R. § 240.12f–2.

By rule, on the day of an IPO Cross, NASDAQ members may place buy and sell orders for execution in the Cross in advance of the opening of trading. (CAC f 136; Rule 4120(c)(7)(B).) The Exchange places those orders in a "holding bin" until the beginning of the "Display Only Period." (*See id.*) During the Display Only Period, members can enter, modify, and cancel orders and "observe the evolution of the prospective auction price through NASDAQ's dissemination of auction imbalance information, thereby enabling members (and their customers) to participate in IPO price discovery." (CAC ¶ 135; *see also id.* ¶¶ 136–37.) The Display Only Period lasts at least 15 minutes, and may be extended in five-minute intervals. (CAC ¶¶ 136–37; *see also* NASDAQ Rules 4120(c)(7)(B) & (C).) NASDAQ's decision to expand the "pre-market order window" from 15 minutes to four hours, (*see* CAC ¶¶ 119–125), was implemented by amending Rule 4120 through the Exchange Act's public rulemaking process before the Facebook IPO. *See IPO Order Holding Bin Rule Filing,* 77 Fed.Reg. 19,044. It applies to the opening of trading after the IPO of any security listed on NASDAQ, not just Facebook. *See* Rule 4120(c)(7)(B). It reflects NASDAQ's regulatory judg-

---

4. All of NASDAQ's current rules are available at http://nasdaq.cchwallstreet.com. Copies of Rules 4120 and 4753 are attached as Exhibits A and C to the Declaration of Paul Lantieri III, July 7, 2013 ("Lantieri Decl.").

ment that allowing earlier order entry for all IPOs would "result[ ] in a higher level of order interaction at the open" and thus, in furtherance of the goals of the Exchange Act, "remove impediments to and perfect the mechanism of a free and open market." *See IPO,* 77 Fed.Reg. at 19,045 (citing 15 U.S.C. § 78f(b)(5)).

After the Display Only Period, the remaining steps in the Cross process typically take a small fraction of a second. (*See* CAC ¶ 249; *see also* SEC Order ¶ 7 ("The electronic calculation ... usually takes approximately one to two milliseconds to complete.").) NASDAQ's IPO Cross Application analyzes buy and sell interest and determines the price at which the largest number of shares will trade. (CAC ¶ 138; *see also* NASDAQ Rule 4753(b).) After performing this calculation, the system checks whether, in the very brief intervening moment, NASDAQ received any cancellations of orders that would be included in the Cross. (CAC 1142.) If this "validation check" fails, the system re-calculates the price and volume of the Cross, taking into account orders and order modifications received since the initial calculation. (*See* CAC ¶ 143.) If the validation check passes, NASDAQ sends the opening "bulk" trade to the consolidated tape, disseminates the opening price, and sends Cross transaction confirmation reports to its members. (CAC ¶ 138.)

NASDAQ designed the validation check to protect the integrity of the IPO process. "NASDAQ's IPO Cross system is designed to ensure that cancellations submitted while the Cross is calculating, and up until the last moment before the Cross is completed, are accounted for in the Cross." (CAC f 142); *see also Proposed Rule Change to Amend Rule 4626—Limitation of Liability,* Exch. Act Rel. No. 67,507 (July 26, 2012), 77 Fed.Reg. 45,706, 45,709 (Aug. 1, 2012) ("Accommodation Propos-

al"); *id.* at 45,708 ("[T]he benefits of the Cross include optimizing an opening price and allowing investors to cancel their orders at the last possible moment."). Prior to the IPO, NASDAQ had not tested a backup system should the validation check fail.

## B. *NASDAQ's Actions Taken to Secure the Facebook IPO*

NASDAQ OMX competed aggressively with the NYSE for the Facebook IPO. (*Id.* ¶¶ 104–110.) The Facebook IPO was important to Defendants as the offering was expected to be, and in fact became, the largest IPO in NASDAQ's history. (*Id.* ¶ 112.) To secure the IPO, Defendants shortened from two years to three months the "seasoning" period usually required for inclusion in the NASDAQ–100 Index. (*Id.* ¶¶ 113–18.) News reports observed that "[i]nclusion in the NASDQ–100 Index may have spurred Facebook toward NASDQ," because it could "create $2 billion to $3 billion of systematic demand for the stock." (*Id.* ¶ 114.)

Defendants also made numerous statements prior to and after securing the Facebook IPO regarding the capability and reliability of NASDAQ's technology and trading platforms (CAC 11168–69) in the months leading up to the Offering, including that:

- NASDAQ is "always committed to working with regulators, exchanges and market participants to ensure transparent trading and a fair and orderly market *for the benefit of investors."* (CAC ¶ 172 (citing 2011 Form 10–K));

- "[NASDAQ] provides technology to customers with the speed, scale and reliability required *to meet the specific needs of their markets."* (*Id.* at ¶ 169 (citing 2011 Form 10–K));

- "[O]ur platforms are highly scalable with current capacity at ten times the average daily volume allowing significantly higher transaction volume to be handled at low incremental cost." (*Id.*)

- "Our platform continues to stand out as a reliable, flexible, and high capacity system *delivering high levels of execution quality and speed under even extremely demanding market conditions.*" (*Id.* at ¶ 173 (citing 2011 Form 10–K));

- NASDAQ's "continued investment in technology to meet customers' demands for speed, capacity, and reliability as markets adapt to a global financial industry, as increasing numbers of new companies are created, and as emerging countries show ongoing interest in developing their financial markets." (*Id.* at ¶ 180 (citing First Quarter 2012 Form 10–Q));

- "No trading platform on the planet *is faster or more scalable.*" (*Id.* at ¶ 186 (citing May 11, 2012 Investor Day Conference));

- "Our technology can help trade and clear any and every financial instrument on the planet." (*Id.*);

- "We have unique capabilities unmatched by any exchange in the world." (*Id.*);

- "[NASDAQ] delivers innovative products and services *that provide transparency to institutional, retail and individual investors.*" (*Id.*);

- "[W]e're well known for our technology, *no trading platform in the world can operate faster or at the scale that we operate*.... [O]ur technology can trade and clear really any instrument on the planet." (*Id.*

at ¶ 188 (citing May 11, 2012 Investor Day Conference)); and

- "We process billions of transactions in a day at sub-microsecond speeds to millions of customers. And as much as that's table stakes, that's hard work just to make sure you have that reliability and capability." (*Id.*)

These statements contributed to NASDAQ securing the Facebook IPO, and its subsequent promotion of the Offering.

### C. *Defendants' Testing in the Pre–IPO Period Revealed Systems issues Regarding the Facebook IPO*

Prior to the Facebook IPO, Defendants undertook a series of tests on NASDAQ's systems. (CAC ¶¶ 119–125, 225–27, 230–33.) The CAC alleges that Defendants' testing revealed system limitations, including design deficiencies in the IPO Cross system that threatened the reliability of NASDAQ's trading platforms to properly execute the Offering. (*Id.*) Despite this "knowledge that NASDAQ's trading systems were susceptible to failure," NASDSAQ continued to publicize its technology and proceed with the IPO. (*Id.* ¶ 121, 122 ("Defendants had knowledge of potentially significant problems with NASDAQ's IPO software in the days leading up to the Facebook IPO, but chose to move ahead with the Facebook IPO before these problems were thoroughly investigated and competently resolved"); *see also* SEC Order ¶ 18–20, 23 (NASDAQ's prior testing revealed that the asymmetric design of the procedure for re-calculating the cross caused the computer to take into account only one cancellation, the first cancellation, that had occurred before the recalculation was made).)

Plaintiffs allege that NASDAQ's IPO systems issues were at least in part the result of NASDAQ's failure to design for or adequately test a high volume of quote

cancellations during the Cross process. (CAC ¶ 249; *see also* SEC Order ¶¶ 20–23 (it was foreseeable that if more than one cancellation had been received prior to the "re-calculation," the re-calculation would have to be repeated and so on continuously in a "loop," such that the market could not open, but NASDAQ did not test how to escape this "loop," or what would happen if NASDAQ disabled the validation check in order to escape the "loop").)

Additionally, the CAC alleges that the "stress tests" Defendants conducted on NASDAQ's systems accounted for only a small fraction of the anticipated total trading volume for the IPO. NASDAQ's testing simulated trading volumes of 6 to 53 million shares and simulated 40,000 pre-market orders. (CAC ¶¶ 120–22, 225–28; *see also* SEC Order ¶ 12.) In the Facebook IPO, more than 80 million shares traded in the first thirty seconds of trading with a total trading volume of 567 million shares and over 496,000 orders were entered into the Cross. (CAC ¶¶ 120–22, 225–28; *see also* SEC Order ¶ 12.) Because of this discrepancy, Plaintiffs allege that Defendants failed to verify whether NASDAQ's systems could properly execute the IPO. (CAC ¶¶ 124, 223–25.) Further, Defendants expanded the pre-market window for investors to place orders for an IPO from 15 minutes to 4 hours. (CAC ¶¶ 119–125.) This contributed to the systems errors that occurred.

Greifeld has acknowledged that NASDAQ's systems constituted a "poor design for the Facebook opening cross IPO," and that the testing before the IPO "didn't account for the increasing volume at which cancellations can come in." (CAC ¶¶ 9, 232.) As a result, NASDAQ "was unprepared for the increasing numbers of cancelled orders in the hours leading up to Facebook's debut." (*Id.*) The "higher the number of orders (and cancellations or changes to those orders), the more income is generated for NASDAQ." (*Id.* ¶ 119.)

### D. Systems Issues Affecting the Facebook IPO Cross

On May 18, 2012, NASDAQ began accepting orders for the Facebook IPO Cross into its trading system's holding bin at 7:00 a.m., and announced that the Display Only Period for the Cross would commence at 10:45 a.m., such that secondary trading would begin at 11:00 a.m. (CAC ¶¶ 136, 140.) At 10:58 a.m., NASDAQ extended the Display Only Period by five minutes at the request of Facebook's lead underwriter. (CAC ¶ 140; *see also* SEC Order ¶ 14.)

At 11:05 a.m., NASDAQ attempted to execute the Facebook IPO Cross, print the opening trade to the tape, and initiate secondary trading, but the Cross process did not operate as expected. (CAC ¶¶ 141–43.) During that calculation, NASDAQ received a cancellation of an order that would have been included in the Cross. Accordingly, the validation check triggered a re-calculation. (CAC ¶ 143.) During the few milliseconds of the re-calculation, NASDAQ received additional cancellations, which triggered additional re-calculations. (*Id.*) This pattern continued, "creating a loop preventing the Cross from calculating a final opening price" and commencing secondary trading at the scheduled time. (*Id.; see also* SEC Order ¶¶ 18–20 (the "loop," revealed during prior testing, caused a delay because the re-calculation of the cross price had to be made repeatedly to catch up with and capture previous cancellations, but each time it could only recalculate one cancellation).)

Immediately thereafter, executives of NASDAQ OMX decided to complete the Cross despite the problems created by the "loop." (CAC ¶¶ 198, 200; *see also* SEC Order ¶¶ 23–25 (certain executives of NASDAQ OMX, including Greifeld, held a

"Code Blue" conference call and decided to complete the Cross).) At 11:13 a.m., NASDAQ issued a Market System Status message advising the public that it was experiencing a delay in delivering the opening print in Facebook stock and that the "first print in Facebook [would] open at approximately 11:30 ET." (CAC ¶¶ 196–201.) The message did not relate the IPO Cross system failure, or the then-known problems associated with the Cross. (*Id.*) Shortly before 11:30 a.m., in order to escape the "loop" and complete the Cross, NASDAQ decided to switch over to the backup system Cross, after first disabling the validation check routine, which had not previously been tested. (*Id.* ¶¶ 29–42.) The switch to the failover system allowed the Cross to complete and secondary trading to open, and at 11:30:09 a.m. NASDAQ released the opening trade at $42. (*See* CAC ¶¶ 146, 149, 151, 199.) The participants at the meeting were allegedly aware, though, that switching to this untested backup system would cause NASDAQ to fail to process a number of cancellations and to assume an unauthorized "error" position in Facebook. (*See* CAC ¶¶ 201–202; *see also* Sec Order ¶¶ 23–25.)

NASDAQ LLC's Rule 4120(a) provides the Exchange with the authority to halt trading under certain circumstances, including when NASDAQ LLC determines that there is "extraordinary market activity" which is likely to have a "material effect on the market for security" and "[i]n circumstances in which [NASDAQ] deems it necessary to protect investors and the public interest." Rule 4120(a). NASDAQ OMX executives determined that no such condition existed and did not halt trading. (CAC ¶¶ 230–231.) At this point, NASDAQ OMX again disseminated two messages to market participants, stating that NASDAQ was "investigating an issue in delivering trade execution messages" for the Facebook IPO Cross and that it was

"working to deliver" such confirmations. (CAC ¶¶ 202–06.) NASDAQ did not acknowledge details concerning the delayed confirmations, the inaccurate price data feeds or the failure to execute certain eligible, pre-market orders.

At 1:50 p.m., NASDAQ delivered pre-market order confirmations. (CAC ¶ 207; *see also* SEC Order ¶ 36.) By this time, the system failures had caused more than 30,000 Cross-eligible orders entered between 11:11 a.m. and 11:30:09 a.m. to remain "stuck" and unexecuted. (CAC SI 209; *see also* SEC Order ¶ 38.) Approximately 13,000 "stuck" orders were released into the secondary market at 1:49:49 p.m., causing a "93–cent decrease in Facebook's share price between 1:50 p.m. and 1:15 p.m." (*Id.*) NASDAQ issued two messages to market participants stating that NASDAQ expected to "deliver all executions from the [Facebook IPO Cross]" at 1:50 p.m. and, later, that such confirmations had "been electronically disseminated." (CAC ¶¶ 207–08.) However, Plaintiffs were unable to close positions until trading began the following Monday at inferior prices. (CAC ¶ 216 ("The offline matching process for orders entered in Facebook between 11:11 and 11:30 AM resulted in nothing done. . . .").)

The initial failure of the design which created the "loop," NASDAQ's determination to switch to the untested failover system, and NASDAQ's decision to proceed with the modified Cross at 11:30 a.m. proximately caused damages to various subclasses of Plaintiffs. (CAC ¶¶ 201–208.)

First, the back-up IPO Cross Application fell behind incoming orders such that orders entered between 11:11 a.m. and 11:30 a.m. were not included in the Cross. Some were cancelled by members before the Cross; some were correctly entered into the market at 11:30 a.m.; and the

remainder were cancelled or released into the market at 1:50 p.m. (CAC ¶¶ 7, 28, 145–46; *see also* SEC Order ¶ 27 (immediately after secondary market trading began, NASDAQ's Chief Economist noticed a discrepancy between the final indicative volume total ($82 million) and the actual volume in the print ($75.7 million), indicating that Cross-eligible orders were not handled properly, but NASDAQ failed to run a real time status check to reveal this problem or address this issue following the Cross).) This damaged classes of individuals attempting to or having purchased Facebook stock. Persons in the cross execution subclass who had entered orders to sell as part of the pre-open cross did not have their sales executed and did not receive the $42.00 per share cross price. (CAC ¶¶ 300–301; *see also* SEC Order ¶¶ 38–39.) These persons suffered a loss after 1:50 p.m. when their stock, which should have been sold at the $42.00 pre-opening cross price, was belatedly sold at the lower prices then prevailing. (CAC ¶ 381.)

Second, NASDAQ's system did not immediately disseminate confirmation reports for orders executed in the IPO Cross. (CAC ¶¶ 7, 37, 145, 151.) Without confirmation, these persons were deprived of the ability to sell at high prices in a rapidly falling market because they had no confirmation that they had purchased. (CAC ¶ 123.)

Finally, accurate quoting data was not delivered to NASDAQ's proprietary feed, causing a stale cross quote for a bid price higher than the ask price. (*See* CAC ¶ 31). In furtherance of the Congressional mandate to link all securities markets "through communication and data processing facilities," 15 U.S.C. § 78k–1(a)(1)(D), the SEC, through Regulation NMS, requires all national securities exchanges to send to the Securities Information Processor ("SIP"):

(i) the exchanges' "top of book" (i.e., best bids and offers ("BBOs")); and (ii) reports of executed trades. The SIP consolidates and makes the data available to the public. *See* 17 C.F.R. §§ 242.601, 602 & 603. After the Facebook IPO Cross, trading occurred on NASDAQ and other markets. (*See* CAC 1121 (more than 80 million shares of Facebook traded in the first 30 seconds of trading and approximately 567 million shares traded on May 18).) NASDAQ accurately and timely reported Its executed Facebook trades to the SIP (Plaintiffs do not allege otherwise), but temporarily did not deliver accurate Facebook quoting data to the SIP or to NASDAQ's proprietary data feeds. (CAC ¶¶ 164–65; *see also* SEC Order ¶ 31.) Persons in the market trading subclass were harmed by these data malfunctions, which prevented accurate quoting data from being delivered to NASDAQ's proprietary feed and instead the feed showed incorrect quote prices. (CAC 1161; *see also* SEC Order ¶ 31.)

### E. *The SEC's Investigation Into and Enforcement Proceeding Against NASDAQ's Handling of the Facebook IPO*

After the Facebook IPO, the SEC began an investigation into the failings of the Offering. The focus in the SEC investigation "was on the design limitation in NASDAQ's system and the Exchange's decision-making after that limitation came to light," both prior to and during the IPO. (Affidavit of Vincent R. Cappucci on August 28, 2013; ("Cappucci Aff."), Exhibit B; SEC Press Release, dated May 29, 2013, at 1 ("SEC Release").) The SEC noted that "[t]oo often in today's markets, systems disruptions are written off as mere technical 'glitches' when it is the design of the systems and the response of the exchange officials that cause us the most concern." (SEC Release at 1.)

The SEC's investigation into NASDAQ culminated in an enforcement proceeding against the Exchange and an Exchange affiliate. The SEC "deem[ed] it necessary and appropriate in the public interest and for the protection of investors that public administrative proceedings and cease-and-desist proceedings be ... instituted pursuant to Section[s] 19(h)(1) and 21C of the [Exchange Act]." (SEC Order § I.) The SEC Order details: (i) the IPO Cross system failures preventing the commencement of open trading; (ii) NASDAQ's switch to an untested backup system that "failed to include 19 minutes of orders in its price/volume calculation," resulting in over 30,000 pre-market orders being either cancelled or executed at inferior prices; (iii) NASDAQ's failure to deliver pre-market order confirmations, preventing investors from determining "whether their orders had been included in the cross ... [and] what position they held in Facebook securities;" and (iv) NASDAQ's executing the 13,000 "stuck" orders at approximately 1:50 p.m. that caused "a 93–cent decrease in Facebook's share price." (SEC Order ¶¶ 17–20, 26, 38, 39.)

"When initiating an IPO, an exchange has an obligation to ensure that its systems, processes and contingency planning are robust and adequate to manage the IPO without disruption to the market." (SEC Order ¶ 2.) Based on the SEC's de-tailed findings covering NASDAQ's system design, NASDAQ's preparedness for the IPO, and the events of May 18, the SEC concluded that NASDAQ failed to meet this obligation due to both a "design limitation in NASDAQ's IPO Cross system" and as a result of "[t]he decisions made by NASDAQ in response to trading disruptions from the design limitation [that] led to further downstream systems issues and caused NASDAQ to violate a fundamental rule governing order priority as well as several other Commission and NASDAQ rules." (SEC Order ¶ 3.) The SEC also found that NASDAQ violated "Rule 4757(a)(1) when it failed to execute equally priced or better priced trading interest in Facebook in price/time priority" in connection with the orders were not executed in the IPO Cross. *Id.* ¶ 58(a); *see also Id.* ¶¶ 58(c)-(d), 63–64.[5] While the SEC concluded that technical regulatory violations flowed from the Exchange's decision to proceed with the Cross, it did not conclude that the decision itself, or the Exchange's subsequent decision not to halt continuous market trading in Facebook stock, violated any law or regulation.

In light of the technical violations, the SEC imposed a civil monetary penalty, censured the Exchange, ordered the Exchange to cease and desist from committing violations of the Exchange Act and

---

**5.** More specifically, the SEC determined that: (i) NASDAQ violated Rule 4120(c)(7) insofar as NASDAQ: did not "immediately initiate trading in Facebook at the conclusion of the [Display Only Period]"; (ii) NASDAQ violated Rule 4120(c)(7) by agreeing to extend the Display Only Period at the request of Facebook's lead underwriter consistent with long-standing and publicly disclosed practice, *id.* ¶ 14, but in the absence of explicit authority for granting such a request; (iii) in connection with the error position in Facebook stock that NASDAQ incurred in the Facebook IPO, NASDAQ and a NASDAQ affiliate violated NASDAQ's rules and the Exchange Act's net capital requirements, respectively; (iv) NASDAQ violated its price/time priority rule in connection with a halt cross for another stock that was impacted by NASDAQ's systems issues with the Facebook IPO; and (v) in separate incidents wholly unrelated to the Facebook IPO in October 2011 and August 2012, NASDAQ committed technical violations of the SEC's Regulation SHO (concerning short sales) and Regulation NMS (concerning "trade throughs") arising from human errors with respect to NASDAQ's systems for enforcing compliance with those regulations. *Id.* ¶¶ 46–55, 58–62.

SEC regulations thereunder, and ordered the Exchange to comply with specified remedial undertakings. (*Id.* § IV.) These included remedial measures to: (i) "enhance its technology change process"; (ii) "deploy new standardized global change management software"; (iii) "dedicate a system and performance engineering team to daily monitoring and analysis of system performance, and [to] establish a new quality assurance organization"; and (iv) "make technical changes ... designed to prevent a recurrence of the persistent recalculation problem that affected the Facebook IPO." (SEC Order at ¶¶ 65–74.) The Exchange consented to the entry of the SEC Order "[s]olely for purposes of [the SEC] proceedings" and without admitting or denying the SEC's findings. (*Id.* § II.)

### F. *The Accommodation Plan for Facebook IPO Losses*

NASDAQ Rule 4626(a) provides that "[e]xcept as provided for in paragraph (b) below, NASDAQ and its affiliates shall not be liable for any losses, damages, or other claims arising out of the NASDAQ Market Center or its use.... [Such losses] shall be absorbed by the member...." Prior to the Facebook IPO, paragraph (b) of Rule 4626 permitted NASDAQ to compensate members up to a maximum aggregate of $500,000 per month for losses sustained in that month by members related to their use of the Exchange. *See* NASDAQ Rule 4626(b)(1).

On July 23, 2012, NASDAQ filed with the SEC its Accommodation Proposal to amend NASDAQ Rule 4626 to permit NASDAQ to pay its members up to $62 million for losses relating directly to the systems issues experienced by NASDAQ in the Facebook IPO. (CAC ¶¶ 10, 299–306; Accommodation Proposal, 77 Fed.Reg. 45,-706.) After considering public comments, including three comment letters submitted by counsel for Plaintiffs (CAC ¶¶ 299–306), the SEC approved the Accommodation Proposal on March 22, 2013 as consistent with the requirements of the Exchange Act and "in the public interest."[6] *See* Order Granting Approval of a Proposed Rule Change to Amend Rule 462 6—Limitation of Liability, Exch. Act Rel. No. 69,-216 (Mar. 22, 2013), 78 Fed.Reg. 19,040, 19,045–47 (Mar. 28, 2013) ("Accommodation Approval Order"); (*see also* Lantieri Decl. Ex.; CAC ¶ 12.)

The SEC noted that it was not deciding whether "regulatory immunity should apply to NASDAQ in connection with its actions related to the Facebook IPO" or "whether NASDAQ or any other person may have violated the federal securities laws or any other laws" in connection with the Facebook IPO. (Accommodation Approval Order at 24–25.)

---

**6.** Rule 4626(b)(3) provides a specific procedure for claims related to the systems issues NASDAQ experienced with the Facebook IPO. Claims must be submitted to and verified by another SRO, the Financial Industry Regulatory Authority, under criteria specified in the Accommodation Proposal. Rule 4626(b)(3). The Rule identifies the specific types of Facebook IPO orders eligible for accommodation and the formula for calculating members' eligible losses, along with procedures for the submission, consideration, and payment of claims. *Id.* The criteria create a framework that seeks to replicate what the expected execution prices of orders would have been had NASDAQ not experienced systems issues, on the assumption that members would exercise reasonable diligence to mitigate losses once made aware that their Cross orders had not executed, or had executed at unexpected prices. *See id.; see also* Accommodation Proposal, 77 Fed.Reg. at 45,710–11. Among other things, the Rule makes payment contingent on members' submission of an attestation detailing the amount of compensation they have provided to their customers, and prioritizes payments to members who compensate their customers. Rules 4626(b)(3)(F)(i) & 4626(b)(3)(G).

The Accommodation Proposal does not guarantee that non-NASDAQ LLC members, including the retail investors, will receive any compensation for losses suffered in the Offering and does not cover the entire losses that were caused by the system failures. (CAC ¶¶ 10–11, 299–313.)

## I. SRO Immunity Applies in Part and is Inapplicable in Part to Plaintiffs' Allegations

As a threshold matter, Defendants contend that all of Plaintiffs' claims arise out of actions taken (or not taken) by NASDAQ within the scope of its regulatory responsibilities and accordingly are precluded under SRO immunity, requiring dismissal of the claims and rendering any amendments to the CAC or any requests to lift the discovery stay futile. SRO immunity provides protection not only from liability, but also from the burdens of litigation, including discovery, and should be "resolved at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991); *see also Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (holding that because immunity affords protection "from suit rather than a mere defense to liability, ... the denial of a substantial claim of absolute immunity is an order appealable before final judgment, for the essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action"); *X–Men Sec., Inc. v. Pataki*, 196 F.3d 56, 65 (2d Cir.1999) ("The immunity protects the official not just from liability but also from suit on such claims, thereby sparing him the necessity of defending by submitting to discovery on the merits or undergoing a trial."); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir.1998) ("[It is] well established that an affirmative defense of official immunity should be resolved as early as possible by the court.").

Because Defendants are correct that an entitlement to immunity would require dismissal and preclude granting further discovery or amendments to the CAC, an initial examination as to whether Plaintiffs' claims are subject to SRO immunity is appropriate.

### A. The Applicable Standard

■ "There is no question that an SRO and its officers are entitled to absolute immunity from private damages suits in connection with the discharge of their regulatory responsibilities." *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 637 F.3d 112, 115 (2d Cir.2011) (quoting *DL Capital Group, LLC v. Nasdaq Stock Mkt., Inc.*, 409 F.3d 93, 96 (2d Cir.2005)); *see also In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 96 (2d Cir. 2007); *D'Alessio v. NYSE, Inc.*, 258 F.3d 93, 105 (2d Cir.2001); *Barbara v. NYSE*, 99 F.3d 49, 59 (2d Cir.1996); *accord Scher v. Nat'l Ass'n of Sec. Dealers, Inc.*, 218 Fed.Appx. 46, 47–48 (2d Cir.2007) (summary order). This immunity extends both to affirmative acts as well as to an SRO's omissions or failure to act. *See, e.g., NYSE Specialists*, 503 F.3d at 97 (failure to supervise); *Gurfein v. Ameritrade, Inc.*, 411 F.Supp.2d 416, 423 (S.D.N.Y.2006) (same); *Dexter v. DTC*, 406 F.Supp.2d 260, 263 (S.D.N.Y.2005) (setting of ex-dividend date); *Am. Benefits Group, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, No. 99 Civ. 4733, 1999 WL 605246, at *4 (S.D.N.Y. Aug. 10, 1999) (creation of reporting requirements for companies included in the OTC Bulletin Board).

■ The party asserting immunity bears the burden of demonstrating its entitlement. *D'Alessio*, 258 F.3d at 104. In assessing the applicability of absolute immunity to a given claim, the SRO's motive and reasonableness are not considered.

*See NYSE Specialists,* 503 F.3d at 95–96 ("The doctrine's nature is such that it accords protection from any judicial scrutiny of the motive for and reasonableness of official action."); *see also Bogan v. Scott–Harris,* 523 U.S. 44, 54, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998) (applicability of absolute immunity accorded to government officials "turns on the nature of the act, rather than on the [officials'] motive or intent"). It is likewise irrelevant whether the complained of conduct complied with the securities laws. *See NYSE Specialists,* 503 F.3d at 98 n. 3 ("[T]he central question ... is not whether the SRO is acting (or not acting) consistent with the laws it is supposed to apply but rather whether the plaintiff's allegations concern the exercise of power within the bounds of the government functions delegated to it.") (internal citations omitted).

■ The doctrine is "of a rare and exceptional character." *Barrett v. United States,* 798 F.2d 565, 571 (2d Cir.1986) (internal quotation marks omitted). Courts examine the invocation of absolute immunity on a case by case basis, *DL Capital Group,* 409 F.3d at 97, using a functional test based upon examination of the "nature of the function performed." *Forrester v. White,* 484 U.S. 219, 229, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988); *see also NYSE Specialists,* 503 F.3d at 96.

■ Absolute immunity inheres in SROs whenever they exercise "quasi-governmental powers [ ] consistent with the structure of the securities market as constructed by Congress, ... [but] when conducting private business, [an SRO] remains subject to liability." *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.,* 159 F.3d 1209, 1213–15 (9th Cir. 1998). The justification for this immunity is that Congress has enabled the SROs to perform "a variety of regulatory functions that would, in other circum-

stances, be performed by a government," and that the government would be immune when performing these functions. *Id.* Examples of such regulatory functions entitling an SRO to immunity include (1) disciplinary proceedings against exchange members, *Barbara,* 99 F.3d at 59; (2) the enforcement of security rules and regulations and general regulatory oversight over exchange members, *D'Alessio,* 258 F.3d at 106; (3) the interpretation of the securities laws and regulations as applied to the exchange or its members, *id.;* (4) the referral of exchange members to the SEC and other government agencies for civil enforcement or criminal prosecution under the securities laws, *id.;* (5) the public announcement of regulatory decisions, *DL Capital Group,* 409 F.3d at 98; and (6) an SRO's amendment of its bylaws where the amendments are inextricable from the SRO's role as a regulator, *Standard Inv. Chartered, Inc.,* 637 F.3d at 116. "The common thread in these cases is that absolute immunity attaches where the activity relates to the proper functioning of the regulatory system." *NYSE Specialists,* 503 F.3d at 96 (internal quotation marks and citations omitted). "Indeed, every case that has found an SRO absolutely immune from suit has done so for activities involving an SRO's performance of regulatory, adjudicatory, or prosecutorial duties in the stead of the SEC." *Weissman v. Nat'l Ass'n of Sec. Dealers,* 500 F.3d 1293, 1296 (11th Cir.2007) (en banc) (collecting cases).

■ Officers and affiliates of SROs are similarly shielded by SRO immunity depending on "the nature of the function performed, not the identity of the actor who performed it." *Forrester,* 484 U.S. at 229, 108 S.Ct. 538. An SRO's officers are thus entitled to absolute immunity when they are, in effect " 'acting under the aegis'

of their regulatory duties." *DL Capital,* 409 F.3d at 97 (finding NASDAQ's CEO Greenfield immune from plaintiff's claims arising from the Exchange's reporting of its decision to halt trading and cancel certain trades) (quoting *Sparta Surgical,* 159 F.3d at 1214). As such, NASDAQ, NASDAQ OMX, and its officers will be treated identically for purposes of immunity.[7]

## B. SRO Protects in Part and is Inapplicable in Part to Plaintiffs' Negligence Claims

The negligence allegations are separated between first, the design, testing and touting of NASDAQ's software, (the "technology negligence claims"), all executed prior to trading, and second, the decision not to halt trading or cancel the impacted trades (the "halting trade negligence claims"), determined during the IPO.

### 1. The Inadequate Design, Testing and Touting of NASDAQ's Software Are Not Regulatory Actions Protected by SRO Immunity

The technology negligence claims in the CAC arise out of the failure of NASDAQ's trading platforms during the IPO, which Plaintiffs contend was the foreseeable result of the inadequate testing of and design for a high volume of cancellations "in the face of projected demand."[8] (CAC ¶ 251.)

Defendants mischaracterize the technology negligence claims, stating that the "negligence claims arise from the commencement of trading in Facebook" or from "NASDAQ's decisions to proceed with and not to halt trading in Facebook," (MTD Br. at 22–23.)[9] Accordingly, Defendants cited precedent supporting immunity involves cases where exchanges determined not to cancel a trade, *see DL Capi-*

---

7. NASDAQ OMX and its officers are "deemed to be" officers of the SRO when their activities are related to the Exchange's regulatory duties;

> To the extent they are related to the activities of a Self–Regulatory Subsidiary [including the Exchange], the books, records, premises, officers, Directors and employees of [NASDAQ OMX] shall be deemed to be the books, records, premises, officers, directors, and employees of such Self–Regulatory Subsidiary for the purposes or and subject to oversight pursuant to the [Exchange] Act.

NASDAQ OMX By–Law Article XII, § 12.1(c). Accordingly, NASDAQ OMX and its officer are liable or protected to the same extent as NASDAQ itself.

8. As alleged, Defendants' prior testing revealed systems limitations, including design deficiencies in the IPO Cross system that threatened the reliability of the trading platforms by creating a "loop" preventing the market from opening, (CAC ¶¶ 119–125, 225–27, 230–33), and Defendants' subsequent stress tests accounted for only a small fraction of the anticipated total trading volume for the IPO. (CAC ¶¶ 120–22, 225–28.)

9. All of NASDAQ's citations to the CAC in this regard either fall outside Section VII (*see* MTD Br. at 4, 23 (quoting CAC ¶¶ 1, 5)) or are limited to allegations concerning NASDAQ's Cross system design, testing and implementation. (*See* MTD Br. at 22–23, 23 n. 15 (quoting CAC ¶¶ 248, 355).) Plaintiffs do allege in Section VII that "Defendants should have followed the recent precedent and protected the integrity of the market by halting the Facebook IPO," but do so in describing the IPO Cross process. Whether NASDAQ concluded that the limited circumstances in which it could halt trading under its regulatory power as delineated in Rule 4120 were not present on May 18 is irrelevant to the independent negligence prior to the cross. That the "orderly initiation of secondary market trading after an IPO is one of the most fundamental functions" of an Exchange and is regulatory in nature, far from "dispositive," is likewise irrelevant to the claim of technology negligence. (*See* Defendant's Opposition to Plaintiff's Motion for Discovery and to Amend ("Def. Mem."); at 24.)

*tal Group, LLC v. Nasdaq Stock Market, Inc.,* 409 F.3d 93, 96 (2d Cir.2005), were accused of self-dealing regarding action or inaction with respect to trading on the exchange, *see NYSE Specialists,* 503 F.3d at 97, and de-listed stock and suspended trading, *see Sparta Surgical,* 159 F.3d at 1211, all of which Defendants correctly assert are regulatory functions protected by immunity. (Def. Mem. at 28.)

 None of the CAC's allegations concerning the technology negligence claims arise from NASDAQ's commencement of trading in Facebook, or NASDAQ's statements and actions concerning its decision to proceed with and not halt trading during the IPO. (*See* CAC ¶¶ 249–269.) Rather, the technology negligence claims focus solely on the design, promotion and inadequate testing of NASDAQ's technology software prior to the

Offering.[10] NASDAQ wished to create an IPO market for companies to be newly listed and traded on its exchange. In furtherance of this venture, NASDAQ proposed, and the SEC authorized, a set of rules for conducting an opening Cross and NASDAQ then designed, implemented and tested electronic systems to perform this opening Cross function.[11] In the months preceding the Facebook IPO, NASDAQ encouraged companies to bring new IPOs to its exchange by publicly broadcasting the capabilities and reliability of its technology in executing offerings, including on NASDAQ OMX's website (CAC ¶¶ 181–83) and during NASDAQ OMX's May 10, 2012 Investor Day Conference (CAC ¶¶ 184–89). These statements were intended to "serve [NASDAQ OMX's] private business interests, such as its efforts to increase trading volume and company profit." [12]

10. The root causes of the injuries alleged by the technology negligence claims also lie in these design and inadequate testing failures, and are independent of NASDAQ's regulatory decisions made during the IPO: The claims of the Cross Buyer and Cross Seller Classes are limited to persons who placed orders that were executed or eligible for execution directly in the pre-opening period, not involving the subsequent secondary market trading or NASDAQ's messages regarding and decision to continue trading; the claims of the Market Trading Class arise from a mispricing error traceable to the pre-opening system failures; and the "stuck" orders Class were prevented from selling due to the design error, which did not generate trade confirmations (CAC ¶¶ 151–52), and led to the dissemination of inaccurate price quotes (*id.* ¶¶ 160–61; *see also* SEC Order ¶ 10 (the "design" of NASDAQ's system "created the risk that if orders continued to be cancelled during each re-calculation, a repeated cycle of validation checks and re-calculations—known as a 'loop'—would occur, preventing" normal secondary market trading).)

11. That the SEC approved this proposed technology "does not automatically convert NASDAQ's conduct into an immunized regulatory function." *Opulent Fund v. Nasdaq Stock*

*Market, Inc.,* 2007 WL 3010573, at *6 (N.D.Cal. Oct. 12, 2007). "SEC approval of a rule imposing a duty on an SRO is not the *sine qua non* of SRO immunity; engaging in regulatory conduct is." *Id.* A business decision regarding the suitability of operational systems to complete a pre-opening Cross, whether or not mandated in a certain way, is not the same as NASDAQ's power to regulate active, ongoing trading. *Id.* ("[I]mmunity protects the power to regulate, not the mandate to perform regulatory functions in a certain manner."); *see also* Rule 4120.

12. The Negligence Plaintiffs do not allege that the NASDAQ representations, in contrast to NASDAQ's statements issued during the IPO, were false or misleading or that the Negligence Plaintiffs have any cause of action based on these representations. NASDAQ's statements leading up to the IPO are alleged in the context of negligence solely to establish NASDAQ's duty, in the exercise of reasonable care, to verify and substantiate the veracity of these statements to investors, who were reasonably likely to rely on these statements and be injured by NASDAQ's failures. (*See* CAC ¶¶ 166–189, 225 (NASDAQ allegedly "should have designed and tested its systems to ensure they would be able to handle the potentially

*Weissman,* 500 F.3d at 1296–99 ("NAS-DAQ represents no one but itself when it entices investors to trade on its exchange."). NASDAQ's software is an integral part of NASDAQ's overall business package, intended to create a market for new, revenue-producing IPO business, not in furtherance of any purported regulatory function. *See Opulent Fund,* 2007 WL 3010573, at *5 (NASDAQ's creation and promotion of the NASDAQ–100 Index was not immune "because it profits from selling the market price data"[13] and because "NASDAQ's market facilitating actions at issue ... were non-regulatory"). There are no immunized or statutorily delegated government powers to design exchange computer software, to appropriately test computer software, or to fix computer software when it is malfunctioning before executing an Offering after touting its competence. The SEC has never engaged in the business aspects of facilitating and promoting IPOs or creating technology to increase trading, nor has Congress authorized it to do so.

Precedent has established that actions such as these, undertaken to "increase trading volume[,] are non-regulatory." *Id.* (quoting *Weissman,* 500 F.3d at 1296); *see also Sparta Surgical,* 159 F.3d at 1214 ("When conducting private business, [SROs] remain subject to liability."). Regulatory actions, including "suspending trading, banning traders, or carrying out disciplinary actions" under mandated rule, "all involve oversight of the market to protect investors." *Opulent Fund,* 2007

WL 3010573, at *6. When there is an active trading market, any decision to halt trading or cancel trades can potentially cause loss to one or another group of market participants. In contrast, actions regarding software design before an IPO or promotion of that software before trading commences does not involve such risks. NASDAQ's duty to adequately design and test software to initiate an unprecedentedly large IPO does not function to protect investors; NASDAQ represents no one but itself when it entices investors to trade on its exchange. NASDAQ's actions functioned to create a market and increase its private trading capacities, conduct which is not protected by SRO immunity. *See, e.g., Opulent Fund,* 2007 WL 3010573, at *6; *Weissman,* 500 F.3d at 1296 ("[A]s a private corporation, NASDAQ may engage in a variety of non-governmental activities that serve its private business interests, such as its efforts to increase trading volume," which are not protected by immunity); *Sparta Surgical,* 159 F.3d at 1214–15 (mere market facilitation designed to increase trading volume is not regulatory conduct).

Securities markets have changed dramatically since the 1930s. Exchanges, like NASDAQ, have converted from non-profit mutual associations owned by their members to for-profit publicly traded corporations owned by shareholders. (*See* SIF-MA letter to Mary Jo White, Chair, SEC, Re: Self–Regulatory Structure of the Securities Markets (July 31, 20130), Cappucci Aff. Ex. F ("[T]he interests, incentives and

unprecedented trading volume *on* Facebook's opening day, including the ability of the systems to execute and confirm the large number of trade orders and cancellations anticipated for execution in the Cross.").)

**13.** That NASDAQ happens to profit from these activities is not critical. The immunity inquiry turns on the nature of the challenged conduct, not its profitability: "if the action is

taken under the 'aegis of the Exchanges Act's delegated authority,' the [SRO] is protected by absolute immunity from money damages." *P'ship Exchange Sec. Co. v. Nat'l Ass'n of Sec. Dealers, Inc.,* 169 F.3d 606, 608 (9th Cir. 1999); *accord DL Capital Group, LLC v. Nasdaq Stock Mkt., Inc.,* 409 F.3d 93, 100 & fn. 4 (2d Cir.2005).

functions of the member-owned cooperative exchange of 1934 bear little resemblance to those of the for-profit publicly traded exchange of today. Since the wave of demutalizations, exchanges have rightly focused their efforts on the part of their business that earns profits to maximize the return for their shareholders, and, in some cases, minimized their actual performance of regulatory functions,").) As SEC Commissioner Gallagher stated in 2012, "the basic premises on which the self-regulatory framework ... [was] put into place almost eighty years ago—private, mutualized, self-regulating exchanges and a simple association of dealers—[are] no longer true." Daniel M. Gallagher, Comm.'s, SEC, Market 2012: "Time for a Fresh Look at Equity Market Structure and Self–Regulation," Speech at the SIFMA's 15th Annual Market Structure Conference (Oct. 4, 2012); (Cappucci Aff., Ex. E.) As exchanges have evolved into for-profit enterprises, an irreconcilable conflict has arisen, rendering independence unattainable in the context of an exchange regulating its own, for-profit business conduct.

This dual-nature of SROs, "as private companies that carry out governmental functions," renders the distinction between actions taken in a governmental capacity, which are immune, and actions taken "for corporate benefit," which cannot be, all the more critical. *Opulent Fund*, 2007 WL 3010573, at *6. Allowing Exchanges to be immune from decisions about the promotion and design of business systems implemented to increase trading volume, particularly in such expanding international markets, would allow unrestrained motives for profit to go unchecked. *See* Scott Patterson, *Dark Pools*, Cross Business New York (2012). As such, the regulatory functions of NASDAQ, including its decisions not to halt trading or announcements of those decisions, do not cloak NASDAQ's independent negligence in failing to adequately design and test its software with retroactive immunity. *Opulent Fund*, 2007 WL 3010573, at *6. ("Nasdaq's pricing conduct is much less quintessentially regulatory than deciding to suspend trading.") (internal citations omitted). If that sufficed, then every time an exchange committed a negligent or unlawful act independent of its regulatory authority, it could purport to consider whether some regulatory power existed and retroactively try to immunize itself from damages for the earlier non-immune conduct. *See* Rohit A. Nafday, *From Sense to Nonsense and Back Again: SRO Immunity, Doctrinal Bait-and-Switch, and a Call for Coherence*, 77 U. Chi. L.Rev. 847, 855 (2010) ("Nafday") (Because absolute immunity frees the recipient of its protection from civil liability unconditionally, it is fraught with potential for abuse). While the doctrine of SRO must continue to ensure regulatory independence, it cannot be applied to allow blanket protection for exchanges when they fail to exercise due care in their pursuits of profit.[14] *See Weissman*, 500 F.3d at 1295 ("Grants of immunity must be narrowly construed" because they deprive injured parties of remedies); *see also Marbury v. Madison*, 5 U.S. 137, 147, 1 Cranch 137, 2 L.Ed. 60 (1803) ("It is a settled and invariable principle, that every right, when withheld, must have a remedy, and every injury its proper redress.").

Given that the technology negligence allegations involve actions taken in NASDAQ's own interest as a private entity to increase trading on its Exchange, absolute

---

**14.** NASDAQ LLC's accommodation plan pays only limited compensation for only limited types of claims, and only to NASDAQ LLC members, not retail investors. This limitation of liability implies a lack of overall immunity as to NASDAQ's actions, and likewise prevents Plaintiffs from recovery if immunity were all encompassing.

immunity from suit ceases to obtain. Accordingly, Plaintiffs' technology negligence claims are not shielded by SRO immunity.[15]

### 2. The Decision Not to Halt Trading is Protected by SRO Immunity

■ In addition to the testing and design of NASDAQ's software, Plaintiffs allege that NASDAQ's decision not to halt trading during the IPO or cancel impacted trades was not a regulatory function and subjects NASDAQ to damages for negligence.

NASDAQ, during the Facebook IPO shortly after trading commenced and the technology errors began, "decided that extraordinary market activity was not occurring, and the EVP/Transactions concluded that NASDAQ therefore did not have the authority to halt trading" under Rule 4120[16]. (SEC Order ¶ 32.) The SEC Order also determined that NASDQ did not have delegated authority to halt trading during the IPO because market trading was proceeding normally and the rule's preconditions were not satisfied. Because the decision not to halt trading was therefore not made pursuant to any official SEC rule, Plaintiffs assert that the decision was not regulatory. In addition, Plaintiffs

maintain that NASDAQ treated the system failures as business issues appropriate for discussion by officers of the holding company, and not issues reserved for independent decision-making by the regulatory arm of the Exchange, (See Exchange Registration Approval Order at *3 (NASDAQ OMX "will not itself carry out regulatory functions.").)

■ The capacity to suspend trading, irrespective of the identity of the decision-maker or the presence of an official SEC rule, is a quintessentially regulatory function. See, e.g., DL Capital, 409 F.3d at 96; NYSE Specialists, 503 F.3d at 97 (finding that the exchange had immunity given that the underlying actions involved "NYSE's action or inaction with respect to trading on the Exchange, which is indisputably within the NYSE's regulatory powers"); Sparta Surgical, 159 F.3d at 1211, 1215 (finding that when NASD "acts in [its] capacity to suspend trading" and de-list stocks, NASD is "performing a regulatory function cloaked in immunity" as "there are few functions more quintessentially regulatory than suspension of trading."). In DL Capital, the plaintiff sued NASDAQ and Greifeld for their decision to halt trading and for failing to announce timely that

---

**15.** Defendants contend that state law claims, such as negligence, against self-regulatory organizations are preempted by the Exchange Act. (Def. Mem. at 20.); see also DGM Invs. v. N.Y. Futures Exch., Inc., 2002 WL 31356362, at *5 (S.D.N.Y. Oct. 17, 2002) (Sweet, J.) (a commodities trader's state law claims for gross negligence, bad faith, and respondeat superior against the New York Futures Exchange, its parent company, its corporate affiliate, and a committee of the exchange and its members were preempted by the CEA because the claims were based on allegations that the defendants "failed to fulfill their obligation to regulate the market."). Defendants are correct that preemption precludes allowing state law claims that arise from actions taken by Defendants in their regulatory capacity as agents of the government or even

actions "incident to the exercise of regulatory power." NYSE Specialists, 503 F.3d at 98. This does not preclude state law claims arising from actions taken by an SRO in its capacity as a for-profit business, including designing and testing software, for the same reasons why SRO immunity is inapplicable to such actions.

**16.** Rule 4120 is a limited delegation of authority to halt trading only in certain enumerated cases, including when "extraordinary market activity in the security is occurring," such as the execution of a series of transactions for a significant dollar value at prices substantially unrelated to the current market. (SEC Order ¶ 32, quoting NASDAQ LLC Rule 4120(a).)

it was cancelling the trades at issue. 409 F.3d at 96. In affirming dismissal of the complaint on grounds of immunity, the Second Circuit confirmed that an Exchange's decision regarding "the actual suspension or cancellation of trades" is protected by SRO immunity. *Id.* at 98. This applies with equal force to NASDAQ's decision not to halt or cancel trades during the Facebook IPO. *NYSE Specialists,* 503 F.3d at 97 ("The power to exercise regulatory authority necessarily includes the power to take no affirmative action."). If an SRO's exercise "of a governmental power delegated to it deserves absolute immunity, the SRO's nonexercise of that power also entitles it to immunity." *Id.* The fact that NASDAQ determined that Rule 4120 did not apply, or that the determination was made by officers of NASDAQ OMX, *see infra* I.(A) n. 9, does not alter the nature of the underlying action. As such, Plaintiffs' negligence claims with respect to halting trading are protected by SRO immunity.

## C. *SRO Immunity Protects in Part and is Inapplicable in Part to Plaintiffs' Securities Act Claims*

Plaintiffs' contend that Defendants violated Section 10(b) of the Exchange Act and Rule 10b–5 based on Defendants' pre-Class Period and Class Period allegedly false and misleading statements of material fact. These statements can be divided into two categories: (1) failure to update pre-Class Period statements touting the reliability and capability of NASDAQ's technology and trading platforms ("pre-Class Period Statements"); and (2) failure to speak completely and accurately in connection with disseminating "Market System Status" messages to market participants during the Class Period ("Class Period Statements").

### 1. *Defendants' Omissions Relating to the pre-Class Period Statements Concerning the Capabilities of NASDAQ's Exchange Systems are not Subject to SRO Immunity*

The CAC alleges that Defendants made material omissions in neglecting to correct false and misleading statements of material fact leading up to the IPO (1) in NASDAQ's 2011 Form 10–K; (2) in NASDAQ's First Quarter 2012 Financial Results; (3) on NASDAQ's website; and (4) during NASDAQ's May 10, 2012 Investor Day Conference. These statements touted and detailed the purported reliability and speed of NASDAQ's technology and trading platform capabilities. (*See, e.g.,* CAC ¶ 169 ("[O]ur platforms are highly scalable with current capacity at ten times the average daily volume"); ¶ 170 ("At NASDAQ OMX, we are committed to innovation through technology to ensure our position as a driving force in the exchange industry and to provide the best possible trading experience for our customers and investors"); ¶ 182 ("Our proven delivery methodology ensures delivery on-time, on-target and ready-to-launch.").) During the Investor Day Conference on May 10, 2012, one week prior to Facebook's IPO, NASDAQ continued to proclaim its "technolog[ical] excellence" without correction, even though prior testing had revealed significant systems limitations. (*See* CAC ¶ 188 ("no trading platform in the world can operate faster or at the scale that we operate.").)

None of NASDAQ's omissions regarding these advertisements relate to its statutorily delegated responsibility to "prevent fraudulent and manipulative ... practices," "promote just and equitable principles of trade," "remove impediments to and perfect" the free market, or "protect investors and the public interest." 15 U.S.C. § 78*o*(3)(b)(6). The advertisements

were in no sense mandated by, or coterminous with, any regulatory activity contemplated by the Exchange Act. Instead, as a private corporation, NASDAQ placed these advertisements to secure the Facebook IPO and, as a result, increase company profits and trading volume on the Exchange. These statements engendered "[the] trust and confidence of the investing public, including Plaintiff[s]," that when they participated in NASDAQ's IPO, NASDAQ's systems would be secure. *Weissman,* 500 F.3d at 1296. "Even if NASDAQ's status as a money-making entity does not foreclose absolute immunity for any number of its activities," its public announcements and advertisements touting its ability to outperform other exchanges cannot be said to directly further its regulatory interest under the Securities Exchange Act. *Id.* at 1311. As discussed above, in determining whether to suspend or halting trading during an IPO, NASDAQ "stands in the shoes of the SEC"; "NASDAQ represents no one but itself when it entices investors to trade on its exchange." *Weissman,* 500 F.3d at 1296; *see also Opulent Fund,* 2007 WL 3010573, at *5 (because NASDAQ created and promoted the NASDAQ–100 Index "because it profits from selling the market price data," this for-profit business function rendered immunity improper).

Servicing NASDAQ's "own business, not the governments" serves to increase trading and is non-governmental conduct "unprotected by absolute immunity." *Id.; see also Opulent Fund,* 2007 WL 3010573, at *5 (mere "market facilitation," or the promotion thereof, is not regulatory conduct); *Sparta Surgical,* 159 F.3d at 1213 ("When conducting private business, [SROs] remain subject to liability."). In *Opulent Fund,* the court held that when conducting private business, including creating an index and disseminating price information to increase trading and profit on an exchange, NASDAQ's actions were not immune. 2007 WL 3010573, at *5. Similarly, in *Weissman,* the Eleventh Circuit held that NASDAQ was not immune from suit for securities fraud arising from its commercial actions taken to promote a particular security. 500 F.3d at 1297 ("Absolute immunity is not appropriate unless the relevant conduct constitutes a delegated quasi-governmental prosecutorial, regulatory, or disciplinary function," and does not apply "[w]hen an SRO is . . . acting in its own interest as a private entity . . . for [its] own corporate benefit."). The same holds true where, as here, NASDAQ's commercial actions promoted its own technology to encourage increased trading volume in light of the upcoming Facebook IPO.

*DL Capital,* cited by Defendants, is not to the contrary.[17] 409 F.3d at 98. There, the Second Circuit held that statements made incident to an SRO's discharge of its

---

17. Nor is *Std. Inv. Chartered, Inc.,* 2010 WL 749844, at *1 to the contrary. In *Std. Inv. Chartered, Inc.,* the court held that "the consolidation that transferred NASD's and NYSE's regulatory powers to the resulting FINRA is, on its face, an exercise of the SROs' delegated regulatory functions and thus entitled to absolute immunity." *2010 WL 749844,* at *1. The court rejected Plaintiff's attempt "to separate 'financially—related' statements from 'regulatory—related' statements [a]s artificial and unconvincing," given that "amendment of the by-laws itself falls within the parameters of NASD's statutory rulemaking authority." *Id.* (citing 15 U.S.C. § 78s(b)). The fact that the amendment of the by-laws encompassed a financial component was irrelevant, just as is whether the actions at issue here resulted in profit. Instead, the issue turns on whether the underlying nature of the action to which the statements pertain involves a regulatory function. Promoting and enticing investors to trade on NASDAQ's exchange does not constitute such a regulatory function.

regulatory functions are protected by immunity. *Id.* Because the conduct at issue, involving NASDAQ's cancellation of certain trades, was regulatory, the statements announcing that conduct were equally protected. By the same reasoning, just as the underlying conduct of testing and designing technology software to increase trading volume is not immune from liability, nor is NASDAQ's failure to correct the promotional announcements of these technology capabilities.

Because NASDAQ's conduct is non-regulatory "when it engages in advertising activity unsuited to a government actor like the Securities and Exchange Commission," NASDAQ's omissions relating to its pre-Class Period statements are not immune. *Id.*

2. *Class Period Statements were Incidental to NASDAQ's Regulatory Functions and are Subject to SRQ Immunity*

▆▆ During the Facebook IPO, Plaintiffs contend that Defendants concealed the known technological errors NASDAQ was experiencing in its Market System Status Messages, including encouraging members to proceed with submission of pre-market orders despite knowledge of a breakdown in the system and failing to disclose the magnitude of the problems NASDAQ was experiencing despite knowledge that orders were getting "stuck." [18] In addition, NASDAQ announced at 1:57:57 p.m. that all systems were "operating normally," and any problems would be resolved in an "offline matching process," despite knowledge that only orders received prior to 11:11 a.m. participated in the Cross and all orders between 11:11 a.m. and 11:30 a.m. were not properly executed. (CAC ¶¶ 209–210; 216.) The offline matching process did not execute any orders, and Plaintiffs were unable to close positions until trading began the following Monday at inferior prices. (CAC ¶ 216 ("The offline matching process for orders entered in FB between 11:11 and 11:30 AM resulted in nothing done. . . .").)

The Class Period statements involve real time announcements of NASDAQ's decisions regarding its regulatory decisions to suspend, resume or cancel trading. In *DL Capital,* the plaintiffs claimed that

---

18. NASDAQ's Market System Status Messages included the following: (1) "NASDAQ is experiencing a delay in delivering the opening print in Facebook, Inc. (FB). NASDAQ will advise." (CAC ¶¶ 196–197 (statement between 11:13:50 a.m. and 11:30:09 a.m.)); (2) "The first print in FB will open at approximately 11:30 ET. Trading will commence at that time" (CAC ¶ 199 (statement made at 11:28:50 a.m.)); (3) "NASDAQ is investigating an issue in delivering trade execution messages from the IPO Cross in symbol F3, NASDAQ is working to deliver these executions back to customers as soon as possible. NASDAQ will advise" (CAC 1203 (statement at 11:59:39 a.m.)); (4) "NASDAQ is working to deliver pending trade execution status messages from the Facebook, Inc. (FB) IPO Cross. NASDAQ anticipates providing a manual report to participants containing this information shortly. To be later followed with the electronic message summary. NAS- DAQ will provide additional information when available" (CAC ¶ 204 (statement at 1:05:30 p.m.)); "NASDAQ expects to electronically deliver all executions from the Facebook, Inc. (FB) IPO Cross at approximately 13:50 ET. NASDAQ Will advise when this is complete" (CAC ¶ 207 (statement at 1:47:16 p.m.)); "Trade execution messages for the Facebook Inc. (FB) IPO cross have been electronically disseminated. All NASDAQ systems are operating normally." (CAC 1208 (statement at 1:57:57 p.m.)); "For firms that entered orders in Facebook between 11:11 and 11:30 AM and have questions regarding their executions, you must call NASDAQ ... by 5:00 pm with order information if you would like to be included in the resolution of any questions. Our intention is to reach resolution of those trades today through an offline matching process. . . ." (CAC ¶ 213 (statement at 4:23:51 p.m.)).

immunity was inappropriate because plaintiff's were challenging not NASDAQ's regulatory decisions to suspend, resume or cancel trading, but rather the manner in which NASDAQ publicly announced those decisions. 409 F.3d at 98. The Second Circuit held that SRO immunity still applied to those statements made incidental to an SRO's discharge of its regulatory functions because "[a]nnouncing the suspension or cancellation of trades is as much a part of defendants' regulatory duties as is the actual suspension or cancellation of trades." *Id.; see also NYSE Specialists,* 503 F.3d at 100 (SRO immune from liability for the timing and method of announcing official investigations because those actions were "central to effectuating the [Exchange's] regulatory decisionmaking"). As such, just as NASDAQ's underlying decision not to halt or suspend trading is protected by immunity, so too are NASDAQ's Class Period statements announcing these decisions. *See DL Capital,* 409 F.3d at 98 ("Announcing the suspension or cancellation of trades is as much a part of defendants' regulatory duties as is the actual suspension or cancellation of trades.").

Because NASDAQ's statements during the IPO generated profit and advanced its business interest, Plaintiffs maintain that they cannot be protected as regulatory functions. However, as *Opulent Fund* explains, whether or not a statement made by an SRO is used to derive profit is not the determinative inquiry, the underlying nature of the conduct is. 2007 WL 3010573, at *5 n. 1 ("[T]he immunity inquiry turns on the nature of the challenged conduct, not its profitability."). The court in *Opulent Fund* looked not to whether "NASDAQ happen[ed] to profit from its activities," but at the fact that pricing an index is not a "regulatory function," unlike the decision to suspend trading. *Id.* Similarly, the court in *Weissman* denied NAS-

DAQ immunity for false statements involved in the marketing, advertising and promoting WorldCom, not because of the profitability of the ads, but because the statements were "in no sense coterminous with the regulatory activity contemplated by the Exchange Act." 500 F.3d at 1299. *Weissman* affirmed that, in contrast, immunity was required for decisions by an SRO to suspend or halt trading and any announcements concerning such decisions. *See Weissman,* 500 F.3d at 1296 (citing *DL Capital Group,* 409 F.3d at 97–100 (decision to suspend trading of a security, to cancel certain trades, and to announce these actions was immune) and *Sparta Surgical,* 159 F.3d at 1213–15 (decision to suspend trading and delist shares of a company was immune).)

██ Plaintiffs' allegations as to the impropriety of these statements, though essential for pleading securities fraud, are equally irrelevant to the immunity inquiry. Plaintiffs' cited precedent involves cases holding defendants responsible for failing to speak truthfully and completely, or for neglecting a duty to disclose material information, but in none of these cases was the defendant protected by SRO immunity for the statements at issue. (*See, e.g.,* Mem. at 42–43.) "Immunity depends only on *whether* specific acts and forbearances were incident to the exercise of regulatory power, and not on the propriety of those actions or inactions." *NYSE Specialists,* 503 F.3d at 98 (emphasis in original). Allowing Plaintiffs' allegations because they involve the fraudulent nature of these statements would import a "bad faith" or "bad motive" element to absolute immunity, which is incompatible with the doctrine's purpose and would allow plaintiffs to circumvent the immunity bar simply by recasting claims involving protected SRO conduct as arising from fraudulent behavior. *See DL Capital,* 409 F.3d at 99 (if

such exceptions to absolute immunity existed, a plaintiff would "concoct some claim of fraud in order to circumvent the absolute immunity doctrine"); *see also Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir.2005) (absolute immunity "is such that it accords protection from ... any judicial scrutiny of the motive for and reasonableness of official action") (internal quotation marks omitted); *Bernard v. County of Suffolk*, 356 F.3d 495, 503 (2d Cir.2004) (absolute immunity applies even where the challenged conduct was motivated by a wrongful motive as such intent is irrelevant).

"The results of any immunity rule may be harsh," but Congress nevertheless saw fit to delegate to SROs certain regulatory powers for which they "enjoy freedom from civil liability when they act[ ] in their regulatory capacity," even where the SROs "act[ ] in a capricious, even tartuffian manner which cause[s] ... enormous damage." *Sparta Surgical*, 159 F.3d at 1215. Accordingly, Defendants conduct as alleged in Plaintiff's federal securities allegations regarding the Class Period statements are shielded by SRO immunity. (*See* CAC ¶¶ 190–218.)

## II. Defendants' Motion to Dismiss is Granted in Part and Denied in Part

### A. The Applicable Standard

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court construes the complaint liberally, accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993). The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995) (quoting

*Scheuer v. Rhodes*, 416 U.S. 232, 235–36, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Plaintiffs must allege sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Cohen v. Stevanovich*, 722 F.Supp.2d 416, 423 (S.D.N.Y.2010). Though the court must accept the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

### B. Defendants' Motion to Dismiss Plaintiffs' Negligence Claims is Granted in Part and Denied in Part

In Counts III through X of the Complaint, Plaintiffs allege claims against NASDAQ for "ordinary negligence" and "negligence: *res ipsa loquitur*" on behalf of each of four classes or subclasses of Facebook investors who claim to have suffered economic harm as a result of the systems issues experienced by NASDAQ in the Facebook IPO. As found above, these claims can be separated between the negligence technology claims, and NASDAQ's decision not to halt trading during the IPO.

#### 1. The Applicable Standard

Under New York law, to sustain a claim for negligence, a plaintiff must show that the defendant owed the plaintiff a

cognizable duty of care, that the defendant breached that duty, and that the plaintiff suffered damages as proximate result of that breach. *King v. Crossland Sav. Bank*, 111 F.3d 251, 255 (2d Cir.1997).

■ Though members of the Exchange have an established duty of care based on their status, non-members must plead a recognized duty of care owed by Defendants to establish negligence. *See, e.g., Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 727 N.Y.S.2d 7, 750 N.E.2d 1055, 1060 (2001); *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 727 N.Y.S.2d 49, 750 N.E.2d 1097, 1101 (2001) (internal citations omitted) (duty determined "by balancing factors, including the reasonable expectations of parties and society generally, the proliferation of claims ... and public policies affecting the expansion or limitation of new channels of liability."). However, Defendants are correct that the negligence claims of NASDAQ member First New York are barred by NASDQ Rule 4626, which unequivocally provides that "NASDAQ and its affiliates shall not be liable for any losses, damages, or other claims arising out of the NASDQ Market Center or its use." [19]

2. *Defendants' Motion to Dismiss Plaintiffs' Negligence Claims Pertaining to the Design, Testing and Touting of NASDAQ's Systems is Denied*

■ In the exercise of reasonable care, Plaintiffs contend that NASDAQ, given its statements touting its capability and reliability, should have designed and tested its systems to ensure that they would be able to handle the predicted trading volume on Facebook's opening day, including the abil-

ity of the systems to execute and confirm the large number of trade orders and cancellations anticipated for execution in the Cross, (CAC ¶¶ 249–53.) NASDAQ's failure in fulfilling this duty proximately caused the injuries alleged by the various subclasses of negligence Plaintiffs.

■ Defendants do not dispute this causation, but instead assert that Plaintiffs' claims are barred by the economic loss doctrine, under which a plaintiff cannot recover in tort for purely economic losses caused by the negligence of a defendant with whom the plaintiff had no contractual privity. *See Schiavone Constr. Co. v. Elgood Mayo Corp.*, 56 N.Y.2d 667, 451 N.Y.S.2d 720, 436 N.E.2d 1322, 1323 (1982) (adopting economic loss doctrine); *see also* 16 N.Y. Prac., *Torts* § 21:13:10 ("Pursuant to the 'economic loss rule,' there can be no recovery in tort when the only damages alleged are for economic loss.").

Though New York courts have not specifically addressed the applicability of the economic loss doctrine in the context of negligence claims asserted against a securities exchange by members of the investing public, the Court of Appeals has instituted a "duty analysis" to determine whether a "plaintiff's negligence claims based on economic loss alone fall beyond the scope of the duty owed them by defendants." *Finlandia*, 727 N.Y.S.2d 49, 750 N.E.2d at 1101; *see also King County v. IKB Deutsche Industriebank AG*, 863 F.Supp.2d 288 (S.D.N.Y.2012) (adopting the duty analysis, or whether defendant had a duty to protect the plaintiff, in determining the applicability of the economic loss doctrine). In employing this "duty analysis," it is not required that the defen-

---

**19.** Plaintiffs maintain that First New York only brings securities claims, and Rule 4626 is inapplicable to those claims arising out of material omissions concerning NASDAQ's known system failures, and not out of the use of the NASDAQ Market Center. For the sake of clarity, First New York is barred from asserting negligence claims against NASDAQ.

dant know the identity of each particular plaintiff, or that a contractual relationship existed, so long as the plaintiffs are a "settled and particularized class" with a relationship "so close as to approach that of privity," or that the defendant has a created a duty to protect the plaintiff. *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 2013 WL 837536, at *3 (S.D.N.Y. Mar. 6, 2013).

Plaintiffs' allegations satisfy this focused duty standard for recovery. NASDAQ had a "duty to protect" Plaintiffs against economic losses for orders entered into NASDAQ's systems, which NASDAQ improperly processed. *King Cnty.*, 863 F.Supp.2d at 302. NASDAQ was aware of, promoted, and profited from the widespread public interest in the Facebook IPO and accepted the trade orders for processing and execution. Indeed, "[w]hen initiating an IPO, an exchange has an obligation to ensure that its systems, processes and contingency planning are robust and adequate to manage the IPO without disruption to the market." (SEC Order ¶ 2.) This created a "relationship so close as to approach that of privity." *Abu Dhabi*, 2013 WL 837536, at *3; *see also Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 552–53, 583 N.Y.S.2d 957, 593 N.E.2d 1365 (N.Y.1992) (sustaining a negligence claim for economic loss and noting that the company's duty of care was "not only a function of private contract" but also from "the nature of its services ... affected with a significant public interest."). That brokers directly placed the orders does not eliminate this special relationship; brokers act merely as agents of their customers, who are the real parties in interest and assume the full risk of economic loss from any system failures. *See Conway v. Icahn & Co.*, 16 F.3d 504, 510 (2d Cir.1994). Further, unlike the cases cited by Defendants, *see, e.g., Travelers Cas. and Sur. Co. v. Dormitory Authority. State of N.Y.*, 734 F.Supp.2d 368, 379 (S.D.N.Y.2010) (applying the economic loss doctrine where the "economic loss" was difficult to quantify and would result in "crushing exposure" by "countless parties"), Plaintiffs' alleged losses are determinate and identifiable, each with a separate, carefully defined claim, and each comprising a specified group of Facebook IPO retail investors on a single day.[20] (*See* CAC ¶¶ 360–75 (Cross Buyer Confirmation Class); CAC ¶¶ 376–91 (Cross Execution Class); CAC ¶¶ 392–407 (Market Trading Class).)

In addition, courts have "reasoned that the extent of liability and the degree of foreseeability stand in direct proportion to one another: the more particular the foreseeability that economic loss would be suffered as a result of the defendant's negligence, the more just that liability be imposed and recovery permitted." *532 Madison*, 727 N.Y.S.2d 49, 750 N.E.2d at 1103 (citing *People Express Airlines v. Consolidated Rail Corp.*, 100 N.J. 246, 495 A.2d 107 (1985)). Here, it is alleged that "NASDAQ had knowledge of potentially significant problems with its IPO software in the days leading up to the Facebook IPO, but failed to take adequate precautions to ensure that its software functioned properly." (CAC ¶¶ 257.) Plaintiffs' subsequent monetary losses re-

---

**20.** The Accommodation Order, instituted by NASDAQ, confirms the ability to calculate these losses. The criteria in the order create a framework that seeks to replicate what the expected execution prices of orders would have been had NASDAQ not experienced systems issues, on the assumption that members would exercise reasonable diligence to mitigate losses once made aware that their Cross orders had not executed, or had executed at unexpected prices. *See id.; see also* Accommodation Proposal, 77 Fed.Reg. at 45, 710–11.

sulting from these previously detected flaws were the foreseeable result of NASDAQ's failings. A failure of exchange systems to handle investor trade orders "carefully and competently" has obvious "catastrophic consequences." *Sommer*, 79 N.Y.2d at 552–53, 583 N.Y.S.2d 957, 593 N.E.2d 1365 (sustaining a negligence claim for economic loss against a fire alarm company in part because the failure to construct the alarm "carefully and competently can have catastrophic consequences").

Based on this precedent and the relationships involved, as well as the definite and foreseeable nature of Plaintiffs' losses by NASDAQ, the economic loss doctrine is not applicable and Defendants' motion to dismiss the technology negligence claims is denied.[21]

3. *Motion to Dismiss Plaintiffs' Negligence Claims Pertaining to NASDAQ's Decision not to Halt Trading is Granted*

Though Plaintiffs' negligence claims are not barred by the economic loss doctrine, the underlying actions by Defendants to not halt trading or cancel impacted trades are protected by SRO immunity as discussed above. These claims are therefore dismissed on grounds of immunity, and no other arguments are reached. *See Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 2010 WL 749844, at *1 (S.D.N.Y. Mar. 1, 2010) (because the court dismissed on grounds of immunity, "the [c]ourt [did] not reach the defendants' other arguments.").

C. **Defendants' Motion to Dismiss Plaintiffs' Securities Act Claims is Granted in Part and Denied in Part**

In Counts I and II of the CAC, Plaintiffs allege that they were defrauded into purchasing shares of Facebook in reliance upon allegedly misleading material statements and omissions made by NASDAQ about the qualities and status of NASDAQ's systems. These material statements or omissions, as described above, can be divided into two categories: (1) the pre-Class Period statements; and (2) the Class Period statements.

1. *The Applicable Standard*

"The 'fundamental purpose' of the securities laws is 'to substitute a philosophy of full disclosure for the philosophy of caveat emptor[.]'" *In re Initial Pub. Offering Sec. Litig. (IPO)*, 241 F.Supp.2d 281, 382 (S.D.N.Y.2003) (citing *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963)). To that end, issuers of public statements are subject to liability under Section 10(b) when they either: "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b); *see IPO*, 241 F.Supp.2d at 381 (citing *Glazer v. Formica Corp.*, 964 F.2d 149, 156 (2d Cir.1992)). Rule 10b–5 forbids, in relevant part, making "any untrue statement of a material fact" or omitting "a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5.

 Whether a statement or omission is material turns on whether "there is a substantial likelihood" that: (i) "a reasonable shareholder would consider it im-

---

**21.** NASDAQ does not dispute that Plaintiffs adequately allege the remaining elements of the negligence claims, including that NASDAQ breached its purported duty and this breach proximately caused damages. (*See generally* MTD Br.) As such, these elements are accepted as adequately pled for the purposes of the instant motion.

portant in deciding how to [act]"; or (ii) "the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)); *see also In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 482 (2d Cir.2008), *abrogated on other grounds by Amgen v. Conn. Ret. Plans & Trust*, —— U.S. ——, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013). Material facts include those that "may affect the desire of investors to buy, sell, or hold the company's securities." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir.2001) (citing *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir.1968)). Moreover, the "materiality of a statement or omission cannot be determined in a vacuum," *Cyber Media Grp., Inc. v. Island Mortg. Network, Inc.*, 183 F.Supp.2d 559, 570 (E.D.N.Y.2002), because materiality "necessarily depends on all relevant circumstances." *ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir.2009). "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b–5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir.2000).

2. *Defendants' Motion to Dismiss Plaintiffs' Allegations Based on Material Omissions Surrounding the Pre–Class Period Statements is Denied*

 Plaintiffs allege that Defendants' failure to update pre-Class Period statements touting the reliability and capability of NASDAQ's technology and trading platforms violated Section 10(b)–5 of the Exchange Act. To sustain such a claim, Plaintiffs must prove that Defendants (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury. *See In re Time Warner Inc. Secs. Litig.*, 9 F.3d 259, 264 (2d Cir. 1993); *Burke v. Jacoby*, 981 F.2d 1372, 1378 (2d Cir.1992).

 First, Plaintiffs allege that Defendants' failure to update the following statements by the time of the Facebook IPO was a material omission of fact in light of NASDAQ's direct evidence or reckless indifference to the contrary:

- NASDAQ is "always committed to working with regulators, exchanges and market participants to ensure transparent trading and a fair and orderly market **for the benefit of investors.**" (CAC at SI 172 (citing 2011 Form 10–K));

- "[NASDAQ] provides technology to customers with the speed, scale and reliability required **to meet the specific needs of their markets**" (*Id.* at ¶ 169 (citing 2011 Form 10–K));

- "[O]ur platforms are highly scalable with current capacity at ten times the average daily volume allowing significantly higher transaction volume to be handled at low incremental cost." (*Id.*)

- "Our platform continues to stand out as a reliable, flexible, and high capacity system **delivering high levels of execution quality and speed under even extremely demanding market conditions.**" (*Id.* at ¶ 173 (citing 2011 Form 10–K));

- NASDAQ's "continued investment in technology to meet customers' demands for speed, capacity, and relia-

bility as markets adapt to a global financial industry, as increasing numbers of new companies are created, and as emerging countries show ongoing interest in developing their financial markets." (*Id.* at ¶ 180 (citing First Quarter 2012 Form 10–Q));

- "No trading platform on the planet **is faster or more scalable.**" (*Id.* at SI 186 (citing May 11, 2012 Investor Day Conference)); "Our technology can help trade and clear any and every financial instrument on the planet. (*Id.*);

- "We have unique capabilities unmatched by any exchange in the world." (*Id.*); "[NASDAQ] delivers innovative products and services **retail and individual investors**" (*Id.*); "[W]e're well known for our technology, **no trading platform in the world can operate faster or at the scale that we operate.** ... [O]ur technology can trade and clear really any instrument on the planet." (*Id.* at ¶ 188 (citing May 11, 2012 Investor Day Conference));

- "We process billions of transactions in a day at sub-microsecond speeds to millions of customers. And as much as that's table stakes, that's hard work just to make sure you have that reliability and capability." (*Id.*)

- "Our proven delivery methodology ensures delivery on-time, on-target and ready-to-launch." (*Id.* at ¶ 183.)

Defendants contend that these statements are inactionable as pre-Class Period statements, or alternatively as mere "puffery" incapable of "objective verification" imposing liability. *In re Tower Automotive Sec. Litig.*, 483 F.Supp.2d 327, 336 (S.D.N.Y.2007).

Defendants are correct that the Second Circuit has found pre-Class Period statements to be inactionable. *See In re Refco, Inc. Sec. Litig.*, 503 F.Supp.2d 611, 643 (S.D.N.Y.2007) ("[a] defendant ... is liable only for those statements made during the class period."); *In re IBM Secs. Litig.*, 163 F.3d at 107 (accord). However, Defendants still have a duty to correct "statements that are false at the time they were made, when [a Defendant] learn[s] that its prior statement ... [i]s untrue." *In re J.P. Jeanneret Assoc., Inc.*, 769 F.Supp.2d 340, 375 (S.D.N.Y.2011) (having represented an enterprise as legitimate, defendant had a continuing obligation to apprise the class of information that rendered its assessment incorrect); *see also In re Beacon Assoc. Litig.*, 745 F.Supp.2d 386, 410 (S.D.N.Y.2010) (defendant had a "continuing duty to update or correct past statements when they became known to be misleading"); *In re NovaGold Res. Inc. Sec. Litig.*, 629 F.Supp.2d 272, 301 (S.D.N.Y.2009) ("duty to update applies to 'a statement made misleading by intervening events, even if the statement was true when made.'") (citing *Overton v. Todman & Co.*, 478 F.3d 479, 487 (2d Cir.2007)); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir.1993) (noting that in certain circumstances, an issuer may have "a duty to update opinions and projections ... if the original opinions or projections have become misleading as the result of intervening events"); *In re Quintel Entm't Inc. Sec. Litig.*, 72 F.Supp.2d 283, 292 (S.D.N.Y.1999) (same); (CAC ¶ 190). Here, Plaintiffs' allegations rest not on pre-Class Period statements, but rather on Defendants' failure, or material omission, in correcting these statements by the time of the Facebook IPO, given that NASDAQ had concrete information from the testing of its systems that these statements were no longer accurate. (CAC ¶¶ 119–125, 225–27, 230–33.)

 Statements that are opinions or predictions are not per se inactionable under the securities laws, and may be actionable if they are worded as guarantees or are supported by specific statements of fact, *see Raab v. General Physics Corp.*, 4 F.3d 286, 290 (4th Cir.1993), or if the speaker does not genuinely or reasonably believe them, *see Time Warner*, 9 F.3d at 266; *see also In re Donald Trump Casino Secs. Litig.*, 7 F.3d 357, 368 (3d Cir.1993); *In re IBM Sec. Litig.*, 163 F.3d 102, 107 (2d Cir.1998) (citing *Time Warner*, 9 F.3d at 266). Here, Defendants made specific statements leading up to the Facebook IPO ensuring "on-time, on-target and ready-to-launch" technology, that was "faster" than any Exchange in the world and could operate under "even extremely demanding market conditions." (CAC ¶ 173; 183; 188.) These were not vague, forward-looking statements of optimism, but "involved the representation of existing facts" concerning NASDAQ's capability and reliability to carry out enormous volumes of orders at sub-microsecond speeds, which were readily capable of verification.[22] *See, e.g., In re Quintel Entm't Inc. Sec. Litig.*, 72 F.Supp.2d 283, 291–92 (S.D.N.Y.1999) ("Defendants' statements in the Form 10–Q filed on July 15, 1997 were not forward-looking [or puffery] because they involved the representation of existing facts concerning the number of chargebacks and the value of the AT & T partnership"); *Time Warner*, 9 F.3d at 268 (where Defendant "publicly hyped strategic alliances" as a way to raise capital and failed to correct this, statements were not "puffery" and were actionable under 10b–5).

Because NASDAQ's statements were material, Defendants had a duty to correct and update them once they were found to be untrue. Defendants "knew or should have known [that] their statements became misleading" well before the Facebook IPO: As alleged, NASDAQ was aware through testing of its systems of potential deficiencies in the system; NASDAQ did not test how to correct these deficiencies, and its "stress tests" accounted for only a small fraction of the anticipated total trading volume for the IPO. (CAC ¶¶ 119–125, 225–27, 230–33; *see also* SEC Order ¶¶ 12, 20, 23.); *see, e.g., In re Quintel Entm't Inc. Sec. Litig.*, 72 F.Supp.2d 283, 291–92 (S.D.N.Y.1999). Once this testing revealed inadequacies and flaws in light of the upcoming largest IPO in NASDAQ history, NASDAQ had a duty to correct its prior statements as to its capabilities. *See, e.g., Oran v. Stafford*, 226 F.3d 275, 286 (3d Cir.2000) (a duty to disclose arises when prior statements "become misleading when viewed in the context of subsequent events"); *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir.1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of materi-

---

**22.** Defendants contend that optimistic statements not capable of objective verification are non-actionable "puffery." (MID Br. at 48–49.) The CAC alleges that Defendants did, in fact, objectively verify that NASDAQ's systems were experiencing significant issues in the days leading up to the Facebook IPO. (CAC ¶¶ 1, 17, 22–26, 122–24, 184–85, 333.) Regardless, disputes over the materiality of allegedly false or misleading statements are generally reserved for the trier of fact. *See Basic*, 485 U.S. at 236, 108 S.Ct. 978; *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir.2002) ("Recognizing that the materiality of an omission is a mixed question of law and fact, courts often will not dismiss a securities fraud complaint at the pleading stage of the proceedings, unless reasonable minds could not differ on the importance of the omission."); *cf. Escott v. BarChris Constr. Corp.*, 283 F.Supp. 643, 682 (S.D.N.Y.1968) ("Since no one knows what moves or does not move the mythical 'average prudent investor,' it comes down to a question of judgment, to be exercised by the trier of the fact as best he can in light of all circumstances.").

**466**

al fact when used to emphasize and induce reliance upon such representation."); *Scritchfield v. Paolo,* 274 F.Supp.2d 163, 175–76 (D.R.I.2003) (stressing that "a company's statements that it is 'premier,' 'dominant,' or 'leading' must not be assessed in a vacuum (i.e., by plucking the statements out of their context to determine whether the words, taken per se, are sufficiently 'vague' so as to constitute puffery")); *Manavazian v. Atec Grp., Inc.,* 160 F.Supp.2d 468, 480–81 (E.D.N.Y.2001) (company's "extremely positive" statements about its current and future performance were actionable as defendants failed to disclose materially misleading adverse business trends); *In re Computer Assocs. Class Action Sec. Litig.,* 75 F.Supp.2d 68, 73 (E.D.N.Y.1999) (statements that company's "business is stronger than ever," that there was "strong worldwide demand" for its products, and that company's "business fundamentals are strong" were non-puffery, actionable statements). Instead of revealing these flaws, far from ensuring "transparent trading and a fair and orderly market for the benefit of investors" (CAC ¶ 172), NASDAQ continued making untrue statements amount its capabilities and omitted all information as to its system failures, "significantly alter[ing] the total mix of information available to Class Members." *Time Warner,* 9 F.3d at 267–68. Just as a misstatement about a company's primary product affects an investors decision to purchase that stock, NASDAQ's failure to correct flawed information about its technology capabilities could have impacted Plaintiffs' decision to participate in Facebook's Offering and ability to trade during that Offering. *See Basic,* 485 U.S. at 231–

32, 108 S.Ct. 978 (1988); *Kronfeld v. Trans World Airlines, Inc.,* 832 F.2d 726, 732 (2d Cir.1987) (material facts include those facts "which may affect the desire of investors to buy, sell, or hold the company's securities"); *In re Regeneron Pharm., Inc. Sec. Litig.,* 2005 WL 225288, at *21 (S.D.N.Y. Feb. 1, 2005) ("[I]t would be a sad day when [a] court could determine that misstatements about whether a company's primary product worked did not alter the total mix of information available to the market) (citation omitted"); *cf. Milman v. Box Hill Sys. Corp.,* 72 F.Supp.2d 220, 230 (S.D.N.Y.1999) ("Reasonable investors might certainly consider data from the initial market tests of an important new product line to be significant in their evaluation of the firm's prospects.").[23] This failure thus constituted a material omission under federal securities laws. *See, e.g., Time Warner,* 9 F.3d at 268 (where Defendant "publicly hyped strategic alliances" as a way to raise capital and failed to correct this, statements were not "puffery" and were actionable under 10b–5.); *McMahan & Co. v. Wherehouse Entertainment, Inc.,* 900 F.2d 576, 579 (2d Cir.1990) ("[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."); *Fogarazzo v. Lehman Bros., Inc.,* 341 F.Supp.2d 274, 294 (S.D.N.Y.2004) ("A statement can also be misleading, though not technically false, if it amounts to a half-truth by omitting some material fact."); *cf. TSC Indus.,* 426 U.S. at 450, 96 S.Ct. 2126 (plaintiffs need not show that the omission would have been outcome determinative).

**23.** NASDAQ's general disclaimers of "unanticipated disruptions in service" or that "markets have experienced occasional system failures" (NASDAQ OMX Annual Report (Form 10–K) at 25–26) in its annual report does not remove its liability when it statements directly touted the reliability and capability of handling trade volume as fast as possible in light of the upcoming IPO, despite knowledge of its inadequacies. (*See* MTD Br. at 28.)

■ Second, Plaintiffs allege that Defendants were consciously aware or recklessly acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in NASDAQ's name were materially false and misleading and/or became materially false and misleading due to subsequent events. (CAC ¶ 219.)

■ The PSLRA requires that to support scienter a complaint must plead facts sufficient to show a strong inference that a defendant acted with an intent to "deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007); *see also Novak v. Kasaks,* 216 F.3d 300, 307–08 (2d Cir.2000) (same). In applying this standard, courts must "accept all factual allegations in the complaint as true" and determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 323, 127 S.Ct. 2499 (emphasis in original). The "inference that the defendant acted with scienter need not be irrefutable ... or even the most plausible of competing inferences." *Id.* at 324, 127 S.Ct. 2499 (internal citations omitted). Rather, the inference need only be at least as compelling as any plausible opposing inference from the facts, and if they are equally likely, the action should be permitted to move forward. *Id.* at 324 n. 5, 127 S.Ct. 2499; *see also In re Top Tankers, Inc. Sec. Litig.,* 528 F.Supp.2d 408, 413–14 (S.D.N.Y.2007).

■ Plaintiffs can establish an inference of scienter by alleging facts showing either (a) Defendants' "motive and opportunity" to commit the alleged fraud, or (b) strong circumstantial evidence of conscious misbehavior or recklessness. *ATSI Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir.2007). Courts have determined that a "strong inference of scienter" exists when the facts demonstrate that defendants: (i) benefitted in a "concrete and personal way" from the alleged fraud; (ii) engaged in "deliberately illegal" behavior; (iii) "knew facts or had access to information suggesting that their public statements were not accurate"; or (iv) failed to verify information that Defendants had a duty to monitor. *See Novak,* 216 F.3d at 311. Plaintiffs adequately allege both (iii) and (iv).

■ As alleged in the CAC (*See* CAC ¶¶ 23–24; 121–24; 219–33.), NASDAQ began testing the design of its systems in the days and weeks leading up to the Facebook IPO, which revealed unresolved technical issues undermining the reliability of NASDAQ in executing the anticipated trade volume for the Offering and which were not corrected before the IPO commenced. (CAC ¶¶ 119, 225; *see also* CAC ¶ 224 (*Business Insider* interviewed hedge fund manager who described how NASDAQ "knew its systems were broken before the Facebook IPO".).) These allegations (CAC ¶¶ 119, 224–25), which include purported knowledge of an insider individual (*see* CAC ¶ 224), adequately demonstrate that Defendants knew or should have known of contemporaneous conditions making their omission to correct prior statements touting NASDAQ's software systems materially misleading.[24] *See, e.g.,*

24. Defendants cited precedent is inapposite. In *Campo v. Sears Holdings Corp.,* 371 Fed. Appx. 212 (2d Cir.2010), the Second Circuit noted that press speculation concerning opinions held by a defendant several years prior did not constitute "admissions" of an intent to defraud by that defendant. *Id.* at 215. In *Rosenzweig v. Azurix Corp.,* 332 F.3d 854 (5th Cir.2003) the Fifth Circuit, in affirming the district court's denial of leave to amend the

*In re New Century,* 588 F.Supp.2d 1206, 1228 n. 21 (C.D.Cal.2008) (scienter properly pled based upon allegations that senior management knew of "contemporaneous conditions ... crucial to the core operations of the company" contrary to what their statements conveyed); *In re Check Point Software Tech. Ltd., Sec. Litig.,* No. 03 Civ. 6594(KMB), 2006 WL 1116699, at *4 (S.D.N.Y. Apr. 26, 2006) (misstatements and omissions concerning the "core operations of the company support[ ] the inference that the defendant knew or should have known the statements were false when made"); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,* 324 F.Supp.2d 474, 489 (S.D.N.Y.2004) (same). Scienter based upon recklessness—i.e., "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it," is a "sufficiently culpable mental state for securities fraud." *JP Morgan,* 553 F.3d at 198 (quoting *South Cherry Street, LLC v. Hennessee Group LLC,* 573 F.3d 98, 109 (2d Cir.2009)).

In addition, courts "have found allegations of recklessness to be sufficient where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Goldman v. Belden,* 754 F.2d 1059, 1070 (2d Cir.

1985). In the weeks preceding the public offering, NASDAQ continued to publicly state its unparalleled capacity to handle trading at the "fastest" speeds with a "proven ... on-time, on-target" delivery method. (CAC ¶ 173; 183.) Yet, despite awareness of the anticipated trading volume of the Facebook IPO and flaws revealed in its technology during initial testing, NASDAQ's volume testing in the week leading up to the IPO only simulated one twelfth of the actual anticipated trading. (CAC 1112–22, 225–28 (NASDAQ's volume testing simulated 6 to 53 million shares and replicated only 40,000 pre-market orders whereas 80 million shares traded in the first 30 seconds of trading with total trading volume at 567 million shares); *see also* SEC Order ¶ 1.) Defendants' failure to adequately test and monitor their systems, in light of the anticipated trade volumes and their statements claiming ensured reliability, constitutes scienter. *See Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 47 (2d Cir.1978) (plaintiff's allegations that defendant, his broker, consistently reassured the plaintiff that the investment advisor responsible for the plaintiff's portfolio "knew what he was doing" but never actually investigated the advisor's decisions to determine "whether there was a basis for the [defendant's] assertions" constituted scienter); *SEC v.*

complaint, noted that news articles plaintiffs cited in their motion for leave to amend simply reiterated defendant's "well-documented woes [already alleged in original complaint]." *Id.* at 865. In *Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997 (2d Cir.1988), the Second Circuit noted that the press reports relied on by plaintiffs focused on defendant allegedly engaging in misconduct in other merger deals, instead of the deal at issue. Here, Plaintiffs' well-pleaded allegations, which must be accepted as true at this stage, include allegations by an individual allegedly aware of the design failures at the time. (CAC 1249.) Further, these allegations have been sup-

ported by the SEC Order relating to the FB IPO. The fact that the media reports may or may not constitute "hearsay" (*see* MTD Br. at 53 n. 30) is similarly misplaced; allegations in a complaint are not tested against the rules of evidence. *See, e.g., Castro v. Covenant Aviation Sec., LLC,* No. 12 Civ. 3037(PAC), 2013 WL 3811474, at *2 (S.D.N.Y. Jul. 22, 2013) (noting that, prior to answer or discovery "the Federal Rules of Evidence are inapposite," because, "[a]t this stage, ... 'the court ... has only allegations and no evidence before it.' ") (citing *D.H. Blair & Co. v. Gottdiener,* 462 F.3d 95, 107 (2d Cir.2006)).

*McNulty,* 137 F.3d 732, 741 (2d Cir.1998) (pleading standard for scienter met where the defendant allegedly included false statements in SEC filings despite "the obviously evasive and suspicious statements made to him" by the corporate officials upon whom he was relying for this information and despite outside counsel's recommendation that these statements not be included).

As such, the allegations in Plaintiffs' CAC are sufficient to support a strong inference of scienter at this stage. *See, e.g., Goldman,* 754 F.2d at 1070 (pleading standard was met where the plaintiffs alleged that the defendants released to the investing public several highly positive predictions about the marketing prospects of a computer system to record hotel guests' long-distance telephone calls when they knew or should have known several facts about the system and its consumers that revealed "grave uncertainties and problems concerning future sales of" the system); *Heller v. Goldin Restructuring Fund, L.P.,* 590 F.Supp.2d 603, 622 (S.D.N.Y.2008) (allegations that "defendants had knowledge of facts ... that explicitly contracted their public statements ... alone are enough to satisfy the pleading requirement for scienter"); *Nathel v. Siegal,* 592 F.Supp.2d 452, 465 (S.D.N.Y.2008) (allegations gave rise to strong inference of scienter where defendants had access to internal documents that contradicted their public statements); *Novak,* 216 F.3d at 308 ("[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.").

▮ Third, Plaintiffs allege that a presumption of reliance is appropriate.

▮ Reliance is presumed in securities actions "involving primarily a failure to disclose," *see Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), and may be presumed where plaintiffs plead "an omission of a material fact by one with a duty to disclose." *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.,* 552 U.S. 148, 159, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008); *see also Wilson v. Comtech Telecomms. Corp.,* 648 F.2d 88, 93 (2d Cir.1981) (recognizing *Affiliated Ute* presumption of reliance applies in situations where the gravamen of a complaint's allegations concern material omissions because "reliance as a practical matter is impossible to prove."); *Joseph v. Wiles,* 223 F.3d 1155, 1162 (10th Cir.2000) ("Requiring a plaintiff to show a speculative set of facts, i.e., how he would have behaved if omitted material information had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff"). The CAC's federal securities allegations are based not on Defendants' pre-Class Period statements, as discussed above, but on the material omissions concerning NASDAQ's known system problems, which Defendants had a duty to disclose. The affirmative statements are identified in order to demonstrate that Defendants had a duty to correct or update these material statements in the days leading up to the Facebook IPO. (*See* CAC ¶¶ 168–94 (alleging Defendants had a duty to update various statements touting the reliability of NASDAQ's trading technology once it became clear that these statements were no longer true).) Because the CAC allegations involve "primarily a failure to disclose" that presents a situation where "reliance as a practical matter is impossible to prove," reliance may be presumed under the *Affiliated Ute* doctrine. *See Wilson,* 648 F.2d at 93 (presumption of reliance applies where the complaint does not "rest[ ] primarily on affirmative statements" but on

material omissions, upon which "reliance as a practical matter is impossible to prove"); *see also In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y.2013) (same).

■■■ Finally, Plaintiffs allege that their damages were foreseeable and directly caused by the materialization of the concealed risks by Defendants; namely, NASDAQ's technical limitations, including the breakdown of its IPO Cross system, and Defendants' failure to properly test or announce these concerns with NASDAQ's systems prior to the IPO. (CAC ¶ 238.)

■■■ Loss causation is governed by the Rule 8 notice pleading standard, and can be pled by alleging "the materialization of a concealed risk that causes a stock price to decline." *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F.Supp.2d 511, 534 (S.D.N.Y.2010); *see also Wallace v. IntraLinks*, No. 11 CV 8861, 2013 WL 1907685, at *9 (S.D.N.Y. May 8, 2013) (pleading loss causation "is governed by Rule 8 notice pleading, and therefore a complaint only needs to provide some indication of the loss and the causal connection that the plaintiff has in mind."); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172–73 (2d Cir.2005) (proximate cause shown where "the risk that caused the loss was within the zone of risk concealed by the [ ] omissions alleged."); 15 U.S.C. § 78u–4(b)(4) ("to state a claim for securities fraud, a plaintiff must allege "that the act or omission of defendant . . . caused the loss for which the plaintiff seeks to recover damages."). "Where some or all of the risk is concealed by the defendant's misrepresentation or omissions, . . . loss causation [is] sufficiently pled." *AIG*, 741 F.Supp.2d at 534 (quoting *Nathel*, 592 F.Supp.2d at 467).

The CAC adequately details that the Defendants' material omissions concealed NASDAQ's technology and trading plat-

form risks, and that the materialization of these risks occurred during the IPO and directly caused their losses by: (i) causing erroneous and failed trade executions; (ii) blinding Class Members for as to their then-current positions in Facebook stock due to late and/or missing trade confirmations; (iii) preventing Class Members from executing orders at the National Best Bid/Offer ("NBBO") prices for Facebook stock as required by SEC Reg. NMS; and (iv) exposing Class Members to related failures of the NASDAQ trading platform, resulting in, among other things, an artificial downward pressure on the price of Facebook's stock. (*See CAC* ¶¶ 237; 238; 139–59 (materialization of the risks resulted in (1) failure to properly execute Class Members' buy and sell orders and (2) untimely delivery confirmations of pre-market orders).) Plaintiffs' damages, caused by their inability to trade on a fair and functioning system, were therefore within the "zone of risk concealed" by Defendants. *See Lentell*, 396 F.3d at 173; *AIG*, 741 F.Supp.2d at 534.

Defendants contend that the CAC fails to plead causation because Plaintiffs have not specifically linked any decline in the Facebook stock price shares with a particular misstatement or omission. Plaintiffs' alleged loss is not in the value of the Facebook stock, but rather in Plaintiffs' ability to trade on NASDAQ's flawed technology, which prevented Plaintiffs from properly executing and selling their stock. Pleading loss causation does not equate with proving total damages; the latter requires a fact-intensive analysis after discovery, inappropriate for adjudication at the motion to dismiss stage. *In re Clearly Canadian Secs. Litig.*, 875 F.Supp. at 1420 ("Plaintiffs will later have to come forward with evidence on this point, but that is an issue more properly addressed in a motion for summary judgment."). Based on the

CAC's allegations, "it is not unreasonable to assume at this stage in the litigation that [P]laintiffs may be able to demonstrate that but for" Defendants' material omissions, Plaintiffs may not have placed orders on the Exchange, or that the design flaws and delays did not impact Plaintiffs' ability to functionally execute their orders during the IPO.[25] *In re Clearly Canadian Secs. Litig.*, 875 F.Supp. 1410, 1420 (N.D.Cal.1995) ("In an omissions case" it is "hardly surprising" not to have concrete proof of losses at the pre-discovery phase); (*see also* CAC f 237–38.) Loss causation has therefore been adequately pled.

Accordingly, for the reasons set forth above, the CAC sufficiently alleges all elements of Plaintiffs' pre-Class Period securities act claims and Defendants' motion to dismiss these claims is denied.

3. *Plaintiffs' Class Period Material Statements under 10b–5 are Dismissed on Grounds of Immunity*

Whether or not Plaintiffs' Class Period statements relating to trading give rise to a securities claim is irrelevant given that the statements themselves are protected by SRO immunity. These claims are therefore dismissed on grounds of immunity, and no other arguments are reached. *See Standard Inv. Chartered, Inc.*, 2010 WL 749844, at *1 (because the court dismissed on grounds of immunity, "the

[c]ourt [did] not reach the defendants' other arguments.").

### III. *Plaintiffs' Motion to Partially Lift the PSLRA Discovery Stay is Rendered Moot*

#### A. *The Applicable Standard*

Statute 15 U.S.C. § 78u–4(b)(3)(B) allows the Court to lift a PSLRA discovery stay under appropriate circumstances including:

> In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

15 U.S.C. § 78u–4(b)(3)(B) (emphasis added). *In re Bank of Am. Corp. Sec., Derivative, and Emp't Ret. Income Sec. Act (ERISA) Litig.*, No. 09 MDL 2058(DC), 2009 WL 4796169, at *1 (S.D.N.Y. Nov. 16, 2009) (noting that courts have modified the PSLRA discovery stay when doing so would not frustrate Congress's purposes in enacting the statute); *In re Grand Casinos, Inc. Sec. Litig.*, 988 F.Supp. 1270, 1272 (D.Minn.1997) ("If ... Congress had intended an absolute stay on discovery, then Congress would not have authorized a

---

**25.** In any event, the system errors may have some impact on the stock price. The Cross is designed to identify a single price for the opening of trading in a security that is the subject of an IPO. The price is determined based on supply and demand as represented by orders submitted before the execution of the Cross. (CAC ¶ 134; *see also* NASDAQ Rules 4120 & 4753.) If certain orders are "stuck" or not canceled or executed as appropriate, this flaw can reasonably affect the stock price or cause an artificial downward pressure on the stock. And while Defendants suggest that the decline in Facebook's stock price is attributable to factors other than the

materialization of the NASDAQ systems issues, "the existence of intervening events that break the chain of causation, such as a general fall in the price of stocks in a certain sector, is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss."[25] *AIG*, 741 F.Supp.2d at 534 (whether a stock continued to fall after the incident in question is of no moment at the Rule 12(b)(6) stage without the benefit of any discovery) (quoting *Nathel*, 592 F.Supp.2d at 467); *see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir.2003) (same).

judicial reprieve from such a stay, when a reprieve is needed.").

### B. *Plaintiffs' Motion to Partially Lift the PSLRA Discover Stay is Rendered Moot by the Motion to Dismiss*

█ The SEC Order published on May 29, 2013, is based in large part on internal documents and reports that NASDAQ produced to the SEC in connection with the SEC's investigation of the Facebook IPO. Though the SEC Order is public, these underlying documents are not. Plaintiffs request that the PSLRA discovery stay be partially lifted to require NASDAQ to produce these underlying documents. In the event that discovery not be granted, Plaintiffs request 30 days after the denial of this application to file their Second Consolidated Amended Class Action Complaint ("SCAC") based on the new information contained in the SEC Order, which was only released one month after the filing of Plaintiffs' CAC.

To prevent discovery until a court has deemed a securities fraud complaint sufficient, the PSLRA imposes a stay of all discovery "during the pendency of any motion to dismiss." 15 U.S.C. § 78u–4(b)(3)(B). This stay operates against all parties, including both plaintiffs and defendants. 15 U.S.C. § 78u–4(b)(3)(D). Because this Court has determined that Plaintiffs' complaint sufficiently alleges a claim for securities fraud, Plaintiffs' request to lift the PSLRA is no longer relevant. As such, discovery may proceed within the confines of this Court's ruling on Defendants' motion to dismiss.

### IV. *Plaintiff's Request for Leave to Amend the CAC is Granted in Part and Denied in Part*

#### A. *The Applicable Standard*

Rule 15 of the Federal Rules of Civil Procedure governs the right to amend pleadings, and states that "leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a)(2). The Supreme Court has stated that absent undue delay, bad faith, undue prejudice, or futility, the "mandate" under Rule 15(a)(2) to freely grant leave to amend "is to be heeded." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *see also AEP Energy Servs. Gas Holding Co. v. Bank of Am. N.A.,* 626 F.3d 699, 725 (2d Cir.2010) (" 'The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith.' ") (quoting *Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993)). Generally, amendments are favored because they "tend to facilitate a proper decision on the merits." *Sokolski v. Trans Union Corp.,* 178 F.R.D. 393, 396 (E.D.N.Y.1998) (internal quotation marks) (citations omitted). In instances where plaintiffs discover new facts relating to and supporting claims asserted in an earlier pleading, courts routinely permit amendment on the basis of this new information. *See, e.g., Phillips v. Kidder, Peabody & Co.,* No. 87 Civ. 4936(DLC), 1994 WL 570072, at *4 (S.D.N.Y. Oct. 13, 1994) ("[C]ourts consistently grant motions to amend where it appears that the new facts and allegations are developed during discovery, are closely related to the original claim, and are foreshadowed in earlier pleadings.") (citing cases).

### B. *Plaintiffs May Amend The CAC with Respect to Only Those Claims Not Protected by SRO Immunity*

█ Plaintiffs request an amendment of the CAC to include the findings of the SEC, and the documents based upon those findings, in their operative pleading. (Stay Mem. at 20.) The SEC Order contains new factual findings, released one month after Plaintiffs filed their CAC,

which are directly relevant to and supportive of Plaintiffs' claims. There is no evidence of bad faith as Plaintiffs did not have access to these findings when the CAC was filed, and Defendants do not allege any prejudice resulting from such an amendment.

Instead, Defendants maintain that an amendment would be futile because no newly pled facts overcome Defendants' threshold legal defenses, namely, SRO immunity, the economic loss doctrine, Rule 4626 and Plaintiffs' failure to plead the necessary elements of their 10b–5 claims. As determined above, Plaintiffs have sufficiently alleged their technology negligence and securities claims with respect to the pre-Class Period omissions. As such, Plaintiffs may amend the CAC to include the findings in the SEC Order and further discovery with respect to these allegations. *See, e.g., Phillips v. Kidder, Peabody & Co.,* No. 87 Civ. 4936(DLC), 1994 WL 570072, at *4 (S.D.N.Y. Oct. 13, 1994) ("[C]ourts consistently grant motions to amend where it appears that the new facts and allegations are developed during discovery, are closely related to the original claim, and are foreshadowed in earlier pleadings.") (citing cases).

Plaintiffs' remaining claims, namely the negligence claims relating to NASDAQ's decision not to halt trading and the security claims relating to the Class Period statements during the IPO, are protected by and dismissed on grounds of immunity. Any amendment of Plaintiffs' CAC with respect to these claims would not change the underlying regulatory nature of Defendants' actions, which entitles them to immunity. Plaintiffs' request to amend these claims is therefore denied as futile, *see Billhofer v. Flamel Tech., S.A.,* No. 07–9920, 2012 WL 3079186, at *3 (S.D.N.Y. July 30, 2012) ("[A] motion to amend a complaint may be denied as futile when

the proposed amendment fails to state a claim or would be subject to a successful motion to dismiss."), and such determination is appropriate at this stage. *See, e.g., Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (holding that because immunity affords protection "from suit rather than a mere defense to liability, ... the denial of a substantial claim of absolute immunity is an order appealable before final judgment, for the essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action"); *X–Men Sec., Inc. v. Pataki,* 196 F.3d 56, 65 (2d Cir.1999) ("The immunity protects the official not just from liability but also from suit on such claims, thereby sparing him the necessity of defending by submitting to discovery on the merits or undergoing a trial."); *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 75 (2d Cir.1998) ("[It is] well established that an affirmative defense of official immunity should be resolved as early as possible by the court.").

### *Conclusion*

Based upon the conclusions set forth above, (1) Defendants' motion to dismiss is denied in part and granted in part; (2) Plaintiffs' request to lift the PSLRA discovery stay is rendered moot; and (3) Plaintiff's motion to amend is granted in part and denied in part.

The parties will meet and confer upon the schedule for further proceedings which will be the subject of a pretrial conference at 10 a.m. February 3, 2014, or at such other time as determined by counsel and the Court.

It is so ordered.

### *OPINION & ORDER*

Pursuant to the transfer order from the United States Judicial Panel on Multidistrict Litigation (the "MDL Panel"), en-

tered on October 4, 2012, 41 actions stemming from the May 18, 2012 initial public offering ("IPO") of Facebook, Inc. ("Facebook") are presently before this Court.

The instant motion relates to the class actions against the NASDAQ Stock Market LLC (the "Exchange"), its parent, the NASDAQ OMX Group, Inc. ("NASDAQ OMX," and collectively with the Exchange, "NASDAQ"), Robert Greifeld, NASDAQ OMX's Chief Executive Officer ("Greifeld"), and Anna M. Ewing, NASDAQ OMX's highest-ranking technology officer ("Ewing") (collectively, "Defendants"). Defendants move the Court to alter or amend the Opinion and Order entered on December 16, 2013 (the "December 16 Opinion"), which denied in part Defendant' motion to dismiss the complaint, to include a certification for interlocutory appeal under 28 U.S.C. § 1292(b).

For the reasons set forth below, Defendants' motion is denied.

### Prior Proceedings & Facts

Familiarity with the general background of this case and prior litigation between the parties is assumed and set forth in the December 16 Opinion. 986 F.Supp.2d 428. Certain facts and allegations are repeated in part as relevant to the issues presented by the instant motion.

On June 25, 2013, the NASDAQ Claimant Group moved this Court for an order partially lifting the discovery stay imposed under Section 21D(b)(3)(B) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(3)(B) (the "PSLRA"), to obtain limited discovery consisting of documents and testimony that NASDAQ, and any of their affiliates, parents, subsidiaries, agents and/or employees, provided to the SEC in connection with the SEC's investigation into the May 18, 2012 initial public offering ("IPO") of Facebook, and for leave to amend the Consolidated Amended Class Action Complaint ("CAC"), incorporating relevant facts adduced from the requested discovery materials or alternatively from the SEC Order.

On July 2, 2013, Defendants filed a motion to dismiss Plaintiffs' negligence and federal securities claims alleged in the CAC. These motions were heard and marked fully submitted on October 3, 2013.

In the December 16 Opinion, Defendants' motion to dismiss was denied in part and granted in part; Plaintiffs' request to lift the PSLRA discovery stay was rendered moot by the Opinion; and Plaintiffs' motion to amend was granted in part and denied in part.

On December 30, 2013, Defendants advised the Court of their intention to appeal the Court's Order entered December 16, 2013, pursuant to 28 U.S.C. § 1291, insofar as that Order addressed NASDAQ's immunity from the claims asserted by Plaintiffs. As noted in the December 16 Opinion, the immunity rulings are appealable as of right under the collateral order doctrine and divest the Court of jurisdiction while the appeal is pending. *See, e.g., Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Bradley v. Jusino*, 2009 WL 1403891 (S.D.N.Y. May 18, 2009). Defendants simultaneously advised the Court of their intention to file a motion pursuant to 28 U.S.C. § 1292(b) to certify other aspects of the Court's December 16, 2013 decision for interlocutory appeal. To avoid any possibly uncertainty over the Court's ability to hear the 28 U.S.C. § 1292(b) motion, Defendants requested an extension of time to file the 28 U.S.C. § 1291 till February 14, 2013 so that the 28 U.S.C. § 1292(b) motion could be considered.

Defendants filed their 28 U.S.C. § 1292(b) motion on December 30, 2013.

This motion was heard and marked fully submitted on February 3, 2013.

## I. The Applicable Standard

Section 1292(b) provides for certification of an order for interlocutory appeal when the court determines: "(1) that such order involves a controlling question of law (2) as to which there is a substantial ground for difference of opinion and (3) that an immediate appeal from [that] order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). "These three prerequisites create a significant hurdle to certification, and the barrier is only elevated by the mandate that section 1292(b) be 'strictly limited' because 'only exception circumstances [will] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment.'" *McNeil v. Aguilos,* 820 F.Supp. 77, 79 (S.D.N.Y.1993) (Sotomayor, J.). "[E]ven where the three legislative criteria of section § 1292(b) appear to be mot, district courts retain 'unfettered discretion to deny certification' if other factors counsel against it." *Transp. Workers Union of Am., Local 100 v. NYC Transit Auth.,* 358 F.Supp.2d 347, 351 (S.D.N.Y.2005) (internal citations omitted). The proponents of an interlocutory appeal have the burden of showing that all three of the substantive criteria are met. *See Casey v. Long Island R.R.,* 406 F.3d 142, 146 (2d Cir.2005).

The Second Circuit has held that "interlocutory appeals are strongly disfavored in federal practice," and movants cannot invoke the appellate process "as a vehicle to provide early review [even] of difficult rulings in hard cases," *In re Adelphia Commc'ns Corp.,* 2008 WL 361082, at *1 (S.D.N.Y. Feb. 7, 2008). District Courts must accordingly "exercise great care in making a § 1292(b) certification," *Wausau Bus. Ins. Co.,* 151 F.Supp.2d at 491–92 (citing *Westwood Pharm., Inc. v. Nat'l Fuel Gas Dist. Corp.,* 964 F.2d 85, 89 (2d Cir.1992)), ensuring that § 1292(b) "be strictly construed." *Wausau Bus. Ins. Co. v. Turner Constr. Co.,* 151 F.Supp.2d 488, 491 (S.D.N.Y.2001) (internal quotations marks and citations omitted); *see also In re Ambac Fin. Grp. Sec. Litig.,* 693 F.Supp.2d 241, 282 (S.D.N.Y.2010) (certification of a non-final order pursuant to 28 U.S.C. § 1292(b) is an extraordinary procedure only granted in "exceptional circumstances."); *Lidle v. Cirrus Design Corp.,* 2010 WL 4345733, at *1 (S.D.N.Y. Oct. 29, 2010) ("[T]he power to grant an interlocutory appeal must be strictly limited to the precise conditions stated in the law .... [o]nly exceptional circumstances will justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment.").

## II. Defendants' Fail to Satisfy the High Threshold Required for Certification of an Order for Interlocutory Appeal

Defendants maintain that a certification for interlocutory appeal is appropriate with respect to two issues in the December 16 Opinion: (1) whether the economic loss doctrine bars Plaintiffs' common law negligence claims; and (2) whether Plaintiffs' federal securities claim is entitled to the presumption of reliance established in *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

As an initial matter, this is not an "exceptional" case. The Second Circuit regularly denies interlocutory appeals at such preliminary stages where, as here, the appeal "at most could lead only to a remand for repleading, with possibilities of further interlocutory appeals thereafter.'" *In re Manhattan Inv. Fund Ltd.,* 288 B.R.

52, 56 (S.D.N.Y.2002); *see also Republic Tobacco Co. v. N. Atl. Trading Co., Inc.,* 381 F.3d 717, 728 (7th Cir.2004) (interlocutory appeal is not intended as a "second bite at the apple" that allows the moving party to reargue issues that the court has already addressed and rejected). Further, though a motion for certification may not be used to simply "repeat arguments made in a motion to dismiss," Defendants' motion consists entirely of assertions and precedent unsuccessfully raised in connection with their initial briefs. *S.E.C. v. Gruss,* 2012 WL 3306166, at *4 (S.D.N.Y. Aug. 13, 2012). Regardless, Defendants fail to satisfy the required elements under § 1292(b).

A. *Defendants Fail to Present "Exceptional Circumstances" Necessary to Grant Interlocutory Appeal or Show that an Immediate Appeal Would Materially Advance the Ultimate Termination of the Litigation*

 Although advancement of the litigation is the third of the statutory criteria, "[c]ourts place particular weight on ... whether immediate appeal will materially advance the ultimate termination of the litigation." *Transp. Workers,* 358 F.Supp.2d at 350; *see also Lerner v. Millenco, L.P.,* 23 F.Supp.2d 345, 347 (S.D.N.Y.1998) ("The Court of Appeals has emphasized the importance of the third consideration in determining the propriety of an interlocutory appeal."); *Koehler,* 101 F.3d at 865–66 ("The use of § 1292(b) is reserved for those cases where an intermediate appeal may avoid protracted litigation."). It is also under this criterion that Defendants' motion most clearly falters.

Defendants contend that "there can be no serious doubt that resolution of the questions presented here may materially advance the ultimate termination of the litigation" because if both claims were dismissed on appeal the litigation would end, and because their § 1291 immunity appeal as of right means that the § 1292(b) appeal will not cause any additional delays. (Def. Br. at 8.)

As an initial matter, Defendants are incorrect that a dismissal on appeal on both issues would end the multidistrict litigation. Plaintiffs have made their intention and been granted leave to amend the CAC to reflect the findings of the SEC opinion and the underlying evidence supporting those findings. Defendants' § 1292(b) motion could, at most, "lead only to a remand for repleading, with possibilities of further interlocutory appeals thereafter.'" *In re Manhattan Inv. Fund Ltd.,* 288 B.R. 52, 56 (S.D.N.Y.2002) (citing *Gottesman v. General Motors Corp.,* 268 F.2d 194, 196 (2d Cir.1959)).

In any event, obtaining reversal of an opinion denying a motion to dismiss would almost *always* result in dismissal. If this were sufficient to justify interlocutory review, then such orders would be commonplace. Instead, as noted, such review is strictly reserved for exceptional cases, and is especially rare in preliminary stages of the litigation. This is particularly true for interlocutory review of a motion to dismiss in a securities class action; the Second Circuit has routinely denied § 1292(b) motions at the preliminary stages of a litigation and only four times in the last thirteen years entertained a Section 1292(b) appeal from an order denying a motion to dismiss in a federal securities class action [1].

---

**1.** The four times the Second Circuit has granted review, it has almost exclusively been limited to threshold issues such as jurisdiction, standing and statutes of limitations:

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche, LLP,* 549 F.3d 100 (2d Cir.2008) (appeal of an investment adviser's standing to assert claims on behalf of clients); *Teamsters*

Focusing on the "the institutional efficiency" of the federal court system, as the "the chief concern[ ] underlying Section 1292(b)," *SEC v. Credit Bancorp, Ltd.,* 103 F.Supp.2d 223, 227 (S.D.N.Y.2000), allowing interlocutory review on an undeveloped record at the motion to dismiss stage of a complex multidistrict class action would serve only to impede institutional efficiency by "prolong[ing] judicial proceedings, add[ing] delay and expense to litigants, burden[ing] appellate courts, and present[ing] issues for decisions on uncertain and incomplete records, tending to weaken the precedential value of judicial opinions." *In re World Trade Ctr. Disaster Site Litig.,* 469 F.Supp.2d 134, 144 (S.D.N.Y.2007) (quoting *Koehler v. Bank of Bermuda Ltd.,* 101 F.3d 863, 865–66 (2d Cir.1996)); *see also In re Automotive Parts Antitrust Litigation,* No. 12–md–02311, 2013 WL 4784682, at *4 (E.D.Mich. Sept. 06, 2013) ("Moreover, the Court recognizes that judicial economy interests weigh against an interlocutory appeal. This multidistrict litigation involves numerous other Defendants and allegations of price-fixing of numerous automotive component parts. The Court finds that affording the appellate court the opportunity to address all of the issues at one time at the conclusion of the litigation will facilitate a speedier resolution of this matter than reviewing a portion of the litigation at this time."); *SEC v. Gruss,* 2012 WL 3306166, at *2 (S.D.N.Y. Aug. 13, 2012) ("It does not normally advance the interests of sound judicial administration or efficiency to have piecemeal appeals that require two (or more) three-judge panels to familiarize themselves with a given case, instead of having the trial judge, who sits alone and is intimately familiar with the whole case, revisit a portion of the case if he or she has erred in part and that portion is overturned following the adjudication of the whole case."); *cf. Trans. Workers,* 358 F.Supp.2d at 350 (allowing interlocutory appeal on an issue of first impression where the court "heard evidence and issued a final decision, on a full factual record"). In contrast, denying certification at such early stages avoids needless and unnecessary delay and expense, while a factually complete record is fully developed. *See, e.g., Mills v. Everest Reinsurance Co.,* 771 F.Supp.2d 270, 273 (S.D.N.Y.2009) ("Courts have frowned upon allowing an interlocutory appeal of a denial of summary judgment. Instead, courts prefer to let the trial resolve the outstanding issues."); *Maryland Cas. Co. v. W.R. Grace & Co.,* 128 F.3d 794, 797–98 (2d Cir.1997) (dismissing interlocutory appeal because trial would resolve many outstanding issues); *Parkinson v. April Industries, Inc.,* 520 F.2d 650, 654 & n. 3 (2d

*Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,* 531 F.3d 190 (2d Cir.2008) (appeal concerning pleading of scienter against a corporate defendant); *Litzler v. CC Invs., L.D.C.,* 362 F.3d 203 (2d Cir.2004) (appeal concerning the statute of limitations under Section 16 of the Securities Exchange Act of 1934); *Fed Hous. Fin. Agency v. UBS Americas Inc.,* 712 F.3d 136 (2d Cir.2013) (reviewing the Federal Housing Finance Agency's standing to bring claims on behalf of Fannie Mae and Freddie Mac and the timeliness of its claims), Similarly, in *In re Lloyd's American Trust Fund Litigation,* 1997 WL 458739, at *6 (S.D.N.Y. Aug. 12, 1997), this Court held that although as "a general matter, rulings on the

sufficiency of pleadings are not appropriate for interlocutory review, ... [o]rders involving enforcement of a forum selection clause have been held to present controlling questions of law that are the proper subject of certification for appeal." *Id.* (citing *Gottesman,* 268 F.2d at 196). Because in that case "reversal of the opinion as to the enforceability of the forum selection clauses would result in dismissal of this action in favor of the English forum," interlocutory appeal was determined to be appropriate. These cases are distinguishable from the instant motion where both challenged issues by Defendants pertain to substantive matters based on an undeveloped record, not on threshold matters.

Cir.1975) ("[T]rial judges are constantly confronted with interlocutory decisions, which, if erroneous, may create unnecessary and time-consuming consequences.... For example, an order denying a motion for summary judgment ... [is] not immediately appealable even though the entry of an erroneous order may require additional expense and effort on the part of both litigants and the district court.").

Further, in this case, because both the negligence and federal securities claims allege similar facts and arise out of the same underlying factual event, discovery will significantly overlap. Thus, if either of the two claims is not fully dismissed on appeal, the litigation will continue to advance in substantially the same manner as if the interlocutory appeal had never occurred and will not be affected in either complexity or scope. *See Westwood Pharms. v. Nat'l Fuel Gas Distrib.*, 964 F.2d 85, 88 (2d Cir.1992) (cautioning against the certification of questions in cases where "many of the same factual issues ... would still have to be litigated"); *Isra Fruit Ltd.*, 804 F.2d at 26 (where two issues are "closely related," even if one "were dismissed at this stage in the litigation, there is scant basis for believing that trial of the latter claims would be concluded with any appreciable saving of time."); *Sussman v. I.C. System, Inc.*, 2013 WL 5863664, at *3 (S.D.N.Y. Oct. 30, 2013) (despite parties disagreeing on whether discovery will overlap, court held that in light of the overlapping factual allegations underlying plaintiff's [two claims], discovery as to the claims is likely to overlap). As the Second Circuit has noted, it is "quite unlikely" that an immediate appeal will materially advance the termination of

the litigation where discovery as to the challenged claims "appears likely to overlap to a considerable extent." *Isra Fruit Ltd.*, 804 F.2d at 25–26. Instead, Plaintiffs "may well benefit from the economies of coordinated discovery and other pretrial proceedings conducted in the multidistrict class action." *In re NASDAQ Market Makers Antitrust Litigation*, 938 F.Supp. 232, 234–35 (S.D.N.Y.1996).

Defendants' second contention, that because their § 1291 motion stays the litigation interlocutory appeal would not *delay* the proceedings, similarly misconstrues the statute's third prong. It is not sufficient that an interlocutory appeal will not impede the litigation, "[a]n immediate appeal is considered to advance the ultimate termination of the litigation if that 'appeal promises to *advance* the time for trial or to *shorten* the time required for trial.'" *Trans. Workers*, 358 F.Supp.2d at 350 (quoting *In re Oxford Health Plans, Inc.*, 182 F.R.D. 51 (S.D.N.Y.1998) (quoting 16 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 3930 p. 432 (2d ed. 1996))) (emphasis added); *see also Isra Fruit Ltd. v. Agrexco Agric. Export Co.*, 804 F.2d 24, 26 (2d Cir.1986) (denying certification where determination on appeal would result in "no appreciable saving of time"). Defendants do not explain how their § 1291 motion would advance or further the litigation with the addition of the interlocutory appeal, or cite any authority for such a proposition[2]. To allow Defendants' blanket contention that because a § 1291 motion exists, interlocutory appeal is automatically appropriate "would allow the qualified immunity exception to the final judgment rule to swallow the rule itself." *Small v.*

---

**2.** Defendants do not cite a single case where a district court certified other dispositive matters under Section 1292(b) when faced with a

concurrent appeal of an immunity determination.

*City of New York,* 304 F.Supp.2d 401, 403 (E.D.N.Y.2004).

■ In sum, a piecemeal appeal on issues that could later be corrected via amendment serves to impede judicial efficiency, rather than advance it, and runs counter to the underlying purpose of Section 1292(b). *Consol. Edison, Inc. v. Ne. Util.,* 318 F.Supp.2d 181, 196 (S.D.N.Y. 2004); *see also Koehler,* 101 F.3d at 865 ("it is a rare exception to the final judgment rule that generally prohibits piecemeal appeals."). To avoid such piecemeal litigation and delay, institutional efficiency will be best served here by ensuring development of the case through a full factual on which any appellate rulings might later be based. Accordingly, Defendants' request for certification fails to meet the stringent "burden of persuading the court ... that exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Dicola v. Am. Steamship Owners Mut. Protection & Indem. Assoc., Inc. (In re Prudential Lines, Inc.),* 59 F.3d 327, 332 (2d Cir.1995) (quoting *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 475, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978)) (internal quotation marks omitted).

As § 1292(b) requires that each of the three criteria be satisfied, denial of the motion would be appropriate even if the second and third criteria were not met. *See German v. Federal Home Loan Mortg. Corp.,* 896 F.Supp. 1385, 1398 (S.D.N.Y.1995). However, certain observations and assessments regarding the remaining two criteria will be made in turn.

B. *The December 16 Order does not Involve Controlling Questions of Law*

■ Under § 1292(b)'s first criterion, an issue is " 'controlling' if reversal of the district court's order would terminate the action,", or if the certified issue has precedential value for a large number of cases. *Klinghoffer v. S.N.C. Achille Lauro,* 921 F.2d 21, 24 (2d Cir.1990) (citing J. Moore & B. Ward, 9 Moore's Federal Practice ¶ 110.22[2], at 268 (1990) (collecting cases)); *see also In re Oxford Health Plans, Inc.,* 182 F.R.D. 51, 54–55 (S.D.N.Y. 1998).

First, reversal even on both issues would not terminate the action. "Although technically the question of whether there is a controlling issue of law is distinct from the question of whether certification would materially advance the ultimate termination of the litigation, in practice the two questions are closely connected." *SEC v. Credit Bancorp, Ltd.,* 103 F.Supp.2d 223, 227 (S.D.N.Y.2000) (citing *Duplan Corp. v. Slaner,* 591 F.2d 139, 148 n. 11 (2d Cir. 1978); *Public Interest Research Group of New Jersey, Inc. v. Hercules, Inc.,* 830 F.Supp. 1549, 1557 (D.N.J.1993); Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3930 (1996)). As previously discussed relating to the third criterion, Plaintiffs will still amend the CAC even upon dismissal, and if either claim survives on appeal, given the overlap in discovery of the two issues, the proceedings will not be materially affected in complexity or scope. *See Pereira v. Cogan,* 265 B.R. 32, 34 (S.D.N.Y.2001) (noting that certification is "inappropriate when the 'remaining claims in the lawsuit [are] closely related, and no appreciable savings in time would be realized by an appeal' ") (quoting *Isra Fruit Ltd. v. Agrexco Agric. Export Co.,* 804 F.2d 24, 25–26 (2d Cir.1986)); *cf. ABN Amro Verzekeringen BV v. Geologistics Ams., Inc.,* Nos. 01 Civ. 5661(DC), 02 Civ. 1238(DC), 2003 WL 21543529, at *3 (S.D.N.Y. Jul. 9, 2003) (holding that certification would speed the ultimate resolution of the matter where plaintiffs represented to the court that they would not pursue

any of their claims if the Second Circuit affirmed the court's decision).

Second, Defendants maintain that both issues have significant precedential value, given the abundance of securities class actions and the importance to defendants of the protection of the economic loss doctrine and the narrowness of the presumption of reliance. *See, e.g., 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.,* 96 N.Y.2d 280, 727 N.Y.S.2d 49, 750 N.E.2d 1097, 1101 (2001) ("[i]n drawing laws defining actionable duty, courts must . . . always be mindful of the consequential, and precedential, effects of their decisions."); *Erica P. John Fund, Inc. v. Halliburton Co.,* — U.S. ——, 131 S.Ct. 2179, 2185, 180 L.Ed.2d 24 (2011) (noting the presumption of reliance as the foundation for securities class actions).

 Precedential value is not "per se sufficient to meet the 'controlling issue of law' standard." *SEC v. Credit Bancorp, Ltd.,* 103 F.Supp.2d 223, 227 (S.D.N.Y. 2000) (citing *Klinghoffer,* 921 F.2d at 24 (observing that precedential value is factor to be taken into account but is not requirement); *Oxford,* 182 F.R.D. at 54 (observing that some district courts have held that precedential value alone renders issue "controlling" but disagreeing with that view and holding it to be only a factor)). As the Court explained in *Klinghoffer v. S.N.C. Achille Lauro,* 921 F.2d 21, 24 (2d Cir.1990), cited by Defendants, though the "impact that an appeal will have on other cases is a factor" that may be considered, it is not and need not be the decisive factor. *Id.* (noting that the legislative history of Section 1292(b) "clearly shows that [the court's discretion in permitting interlocutory appeals] encompasses denial of a properly certified appeal—which by definition includes a controlling question of law—for any reason, including docket congestion" regardless of precedential impact).

Here, even considering Defendants' assertions, the allegation that "millions of investors" who "suffer losses daily" would likely add exchanges as defendants based on the December 16 Opinion is unsupported. (Defendant Memorandum of Law, "Def. Br."; at 3–4.) "[A]ssuming arguendo that [Defendants'] characterization of this Court's ruling were correct, it is rather speculative to say that the ruling has precedential value for a large number of cases when those cases have yet to be brought." *Primavera Familienstifung v. Askin,* 139 F.Supp.2d 567, 573 (S.D.N.Y. 2001). Taken together with the concerns for institutional efficiency, the potential precedential impact is "insufficient to warrant 1292(b) certification in light of the circumstances of this case." *SEC,* 103 F.Supp.2d at 227.

Independently, relating to the economic loss doctrine, Section 1292(b)'s first criterion requires a "pure question of law that the reviewing court could decide quickly and cleanly without having to study the record." *In re WorldCom, Inc.,* 2003 WL 21498904, at *10 (S.D.N.Y. June 30, 2003) (internal citations omitted).

 The determination that the economic loss doctrine does not bar Plaintiffs' negligence claims involves questions of fact inappropriate for interlocutory appeal. As the New York Court of Appeals explains, "[a]lthough the existence of a duty is an issue of law for the courts . . . once the nature of the duty has been determined as a matter of law, whether a particular defendant owes a duty to a particular plaintiff is a question of fact." *Kimmell v. Schaefer,* 89 N.Y.2d 257, 652 N.Y.S.2d 715, 675 N.E.2d 450, 453 (1996). The December 16 Opinion applied the legal principle of when defendants owe a duty to plaintiffs to the facts presented in the CAC, and held that such a duty existed based on the existence of a relationship "so close as to approach that of privity," as

well as the foreseeable catastrophic consequences involved. (December 16 Opinion at 461); *see also Travelers Cas. & Sur. Co. v. Dormitory Auth. State of N.Y.*, 734 F.Supp.2d 368, 378–80 (S.D.N.Y.2010); *Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F.Supp.2d 514, 536 (S.D.N.Y.2001) (determinations of whether "special relationships" exist are "generally not susceptible to resolution at the pleadings stage."); *cf. J & R Elecs. Inc. v. Bus. & Decision N. Am., Inc.*, 2013 WL 5203134, at *7 (S.D.N.Y. Sept. 16, 2013) ("With a full factual record, the issue of a special relationship may be ripe at the summary judgment stage."). Interlocutory appeal cannot be used for securing early resolution of disputes concerning whether the trial court properly applied the law to the facts. *Abortion Rights Mobilization, Inc. v. Regan*, 552 F.Supp. 364, 366 (S.D.N.Y.1982). Whether such a relationship will ultimately be established will depend on the development of the factual record, subject to further amendment, and highlights why § 1292(b) motions are "a rare exception to the final judgment rule that generally prohibits piecemeal appeals." *Koehler*, 101 F.3d at 865; *see also Link v. Mercedes–Benz of North America, Inc.*, 550 F.2d 860, 863 (3d Cir.1977), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

As such, Defendants fail to establish the existence of a controlling question of law.

C. *The December 16 Opinion's Application of the Economic Loss Doctrine and the Affiliated Ute Presumption Presents no "Substantial Grounds for a Difference of Opinion"*

■ To adequately plead the second prong of Section 1292(b), the existence of substantial grounds for a difference of opinion, a party seeking certification bears the burden of showing "genuine doubt as to the correct applicable legal standard." *In re WorldCom, Inc.*, 2003 WL 21498904, at *10 (S.D.N.Y. June 30, 2003).

With respect to the economic loss doctrine, Defendants contend that the second criterion is met because (1) there are substantial grounds for disagreeing with the Court's conclusion that the economic loss doctrine does not apply here, and (2) the issue is one of first impression. (Def. Br. at 6.)

First, Defendants assert that the December 16 Opinion incorrectly created a duty to Plaintiffs, despite contradicting New York law holding the need to "limit the legal consequences of wrongs to a controllable degree," *see 532 Madison Ave. Gourmet Foods*, 727 N.Y.S.2d 49, 750 N.E.2d at 1101–03, and that *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 553, 583 N.Y.S.2d 957, 593 N.E.2d 1365 (1992) and corresponding precedent, upon which the December 16 Opinion relies, only applies to physical damage and not economic harm. *Id.*

Defendants misconstrue the Court's holding, as well as the applicable law.

■ Under New York law, a plaintiff may recover economic damages in tort where: (1) a focused duty flows to a definable and manageable class comprised of individuals with a relationship so close as to approach that of privity, *see Landon v. Kroll Lab. Specialists, Inc. (Landon I)*[3], 91 A.D.3d 79, 86, 934 N.Y.S.2d 183 (N.Y.App.Div.2011), *aff'd*, 22 N.Y.3d 1, 977 N.Y.S.2d 676, 999 N.E.2d 1121 (2013); or

---

**3.** Defendants maintain that reliance on *Landon I* is misplaced, because there the court "held only that the plaintiff's allegation of negligent drug testing could proceed where his claimed injuries were loss of his freedom and resulting emotional and psychological

where (2) "the nature of the performance called for is affected with a significant public interest and 'failure to perform the service carefully and competently can have catastrophic consequences.'" *Trustees of Columbia Univ. v. Gwathmey Siegel & Assocs. Architects*, 192 A.D.2d 151, 601 N.Y.S.2d 116, 119 (1993) (citing *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 553, 583 N.Y.S.2d 957, 593 N.E.2d 1365 (1992)).

Applying this established law, the December 16 Opinion held that because NASDAQ's relationship with Class Members was "so close as to approach that of privity," Defendants possessed a "focused duty" to protect Plaintiffs and the Class from the foreseeable "catastrophic consequences" of NASDAQ's system failures. (December 16 Opinion at 460–62.)

Creating a duty without a direct relationship or contractual obligation is not, as Defendants seem to suggest, unusual or exceptional[4]. New York precedent has often upheld negligence claims "notwithstanding the absence of a contractual relationship," for instance in cases where, as here, "the contracting party, in failing to exercise reasonable care in the perform-

ance of [its] duties, launche[s] a force or instrument of harm." *Landon v. Kroll Lab. Specialists, Inc.* (*Landon II* ), 22 N.Y.3d 1, 977 N.Y.S.2d 676, 999 N.E.2d 1121 (2013); *see also Landon I*, 91 A.D.3d at 86, 934 N.Y.S.2d 183 ("The New York Court of Appeals has [further] recognized the existence of tort duties in situations where the relationship between the parties was so close as to approach that of privity even where purely economic injuries have been alleged.").

Further, far from creating a "limitless" class "with no direct relationship", or reasoning that "NASDAQ's potential liability is not indeterminate because it can ascertain, after-the-fact, the identity of harmed investors," (Def. Br. at 5), the December 16 Opinion carefully identified a definable group of investors who entered orders with NASDAQ for Facebook stock on the day of the IPO and who suffered specific economic harm as a consequence of NASDQ's system failure in connection with the IPO. (December 16 Opinion at 461–62.) Though Defendants maintain that the "catastrophic consequences" anal-

harm." (Defendant Reply Brief, "Reply Br."; at 8.) However, *Landon I* specifically explicates the standard for duty:

"A tort obligation is a duty imposed by law to avoid causing injury to others" *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d [308] at 3,16, 639 N.Y.S.2d 283, 662 N.E.2d 763 [ (1995) ], Accordingly, "the liability to make reparation for an injury rests not upon the consideration of any reciprocal obligation, but upon an original moral duty enjoined upon every person so to conduct himself [or herself], or exercise his [or her] own rights as not to injure another." *Rich v. New York Cent. & Hudson Riv. R.R. Co.*, 87 N.Y. 382, 398 (1882); *see New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d at 316, 639 N.Y.S.2d 283, 662 N.E.2d 763; *Havas v. Victory Paper Stock Co.*, 49 N.Y.2d 381, 386, 426 N.Y.S.2d 233, 402 N.E.2d 1136 [ (1980) ]; *see also Heaven v. Pender*, 11 QBD 503, 509 (1883).

*Landon I* at 83, 934 N.Y.S.2d 183, That the court in *Landon I* applied the standard to a different set of facts does not make reliance on the standard articulated "misplaced".

4. That NASDAQ requires its broker-dealers to be members of the exchange, with a contractual membership, does not negate the ability for NASDAQ to ever acquire a duty to members outside of the exchange. *See* Exchange Act Section 6(b), 15 U.S.C. § 78f(b) (2006). To hold as such would go against the basic tenets of tort law. *See Rich v. New York Cent., & Hudson Riv. R.R. Co.*, 87 N.Y. 382, 398 (1882) ("the liability to make reparation for an injury rests not upon the consideration of any reciprocal obligation, but upon an original moral duty enjoined upon every person so to conduct himself [or herself], or exercise his [or her] own rights as not to injure another").

ysis cannot be used to "cabin the duty" created by the December 16 Opinion, the Opinion specifically details such a limitation. The Opinion states that the duty was formed as a combination of the established relationship so close as to approach that of privity between NASDAQ and the investors, *as well as* the fact that a "failure of exchange systems to handle investor trade orders 'carefully and competently' has obvious 'catastrophic consequences.'" (December 16 Opinion at 461 (citing *Sommer*, 79 N.Y.2d at 552–53, 583 N.Y.S.2d 957, 593 N.E.2d 1365).) The Opinion elaborates that the duty was "[b]ased on [established] precedent and the relationships involved, as well as the definite and foreseeable nature of Plaintiffs' losses by NASDAQ." (*Id.*)

Similarly, Defendants' contention that reliance on *Sommer* is inappropriate because subsequent cases have limited *Sommer*, and exceptions to the economic loss doctrine more generally, to physical harm is inapposite. The Second Circuit has relied upon *Sommer* in upholding negligence claims against financial entities and other parties in circumstances not involving physical damage, *see Banco Multiple Santa Cruz, S.A. v. Moreno*, 888 F.Supp.2d 356, 358 (E.D.N.Y.2012), and has otherwise upheld negligence claims in circumstances involving solely economic harm. *Id.* at 370–72 (citing cases); *see also Hecht v.*

*Andover Assoc. Mgmt. Corp.*, 27 Misc.3d 1202(A), 910 N.Y.S.2d 405, 2010 WL 1254546 (N.Y.Sup.Ct. Mar. 12, 2010) (economic loss doctrine did not bar negligence claims against investment advisor recommending Bernie Madoff's firm as investment manager); *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 18 (2d Cir.2000) (rejecting logic of courts have "have applied the economic loss rule to bar recovery where the only loss claimed is economic in nature" and extending to cases involving a "professional duty")[5]. As such, Defendants fail to show that the Court's analysis in any way conflicts with well-establish New York law pertaining to the economic loss doctrine.

Second, Defendants cite the December 16 Opinion's holding that "New York courts have not specifically addressed the applicability of the economic loss doctrine in the context of negligence claims asserted against a securities exchange by members of the investing public," to demonstrate that the issue is one of first impression. (December 16 Opinion at 460.) As discussed, that established law has not been applied to a unique set of facts does not create an issue of first impression; if it did, virtually any case might qualify. Though the economic loss doctrine has not been applied in this specific context, the law is clear: As the December 16

---

**5.** Defendants contend that *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 18 (2d Cir.2000), does not suggest approval of a negligence claim outside the context of professional malpractice. (Reply Br. at 9.) To the contrary, *Hydro Investors, Inc.* extends situations in which the economic loss doctrine should not bar liability in order to ensure appropriate recovery:

While we recognize that some cases have applied the economic loss rule to bar recovery where the only loss claimed is economic in nature, *see County of Suffolk v. Long Island Lighting Co.*, 728 F.2d 52, 62 (2d Cir.1984), and still others have applied that

rule to professional malpractice cases, *see Joseph v. David M. Schwarz/Architectural Servs., P.C.*, 957 F.Supp. 1334, 1339–40 (S.D.N.Y.1997), the better course is to recognize that the rule allows such recovery in the limited class of cases involving liability for the violation of a professional duty. To hold otherwise would in effect bar recovery in many types of malpractice actions.

*Hydro Investors, Inc.*, 227 F.3d at 18. Similarly here, the December 16 Opinion determined that a focused duty was owed resounding in the foreseeable consequences of NASDAQ's systems failures based on the facts presented.

Opinion goes on to specify, "the Court of Appeals has instituted a [well-established] 'duty analysis' to determine whether a 'plaintiff's negligence claims based on economic loss alone fall beyond the scope of the duty owed them by defendants.'" (*Id.* citing *Finlandia,* 727 N.Y.S.2d 49, 750 N.E.2d at 1101; *see also King County v. IKB Deutsche Industriebank AG,* 863 F.Supp.2d 288 (S.D.N.Y.2012) (adopting the duty analysis, or whether defendant had a duty to protect the plaintiff, in determining the applicability of the economic loss doctrine).)

■ Even if the instance were one of first impression, Second Circuit precedent shows "that the fact that an issue presents a question of first impression is insufficient to render the issue grounds for substantial difference of opinion." *Sussman,* 2013 WL 5863664, at *3 (quoting *Sec. & Exchange Comm'n v. Gruss,* No. 11 Civ. 2420(RWS), 2012 WL 3306166, at *3 (S.D.N.Y. Aug. 13, 2012) (citing *In re Flor,* 79 F.3d 281, 284 (2d Cir.1996))); *see also Williston v. Eggleston,* 410 F.Supp.2d 274, 277 (S.D.N.Y.2006) (holding that "[s]imply because a question of law has not been authoritatively addressed" "by either the Supreme Court or the Second Circuit ... does not make the question grounds for a substantial difference of opinion").

■ Ultimately, Defendants do not establish or even contend that New York law is unsettled on this issue. Instead, repeating their same arguments from the motion to dismiss, Defendants assert that the December 16 Opinion incorrectly applied the law to the specified facts creating an instance of "first impression" necessary for review. *See Sussman,* 2013 WL 5863664, at *3 ("A party that offers only arguments rejected on the initial motion does not meet the second requirement of § 1292(b).") That an application of legal principles is a matter of first impression to a unique set of facts, or that Defendants may differ in their view of the correct application of such legal principles, does not create a "substantial difference of opinion." *See supra* I.(A); *see also Von Bulow by Auersperg v. Von Bulow,* 1986 WL 7781, at *1 (S.D.N.Y. July 8, 1986) (given that "there is no conflicting authority on this narrow issue," there can be "no substantial grounds for difference of opinion."); *see also Wausau Bus. Ins. Co. v. Turner Constr. Co.,* 151 F.Supp.2d 488, 491 (S.D.N.Y.2001) ("A mere claim that the district court's ruling was incorrect does not demonstrate a substantial ground for a difference of opinion.").

Defendants also maintain that there is a substantial basis for a difference of opinion regarding the December 16 Opinion's application of the *Affiliated Ute* presumption of reliance to the remaining securities claim. (Def. Br. at 7.) In *Affiliated Ute,* the Supreme Court held that proof of reliance is not required under Rule 10b–5 where the claim is based on "primarily a failure to disclose." 406 U.S. at 153, 92 S.Ct. 1456.

Defendants maintain that the Court incorrectly applied *Affiliated Ute* because Plaintiffs "plead specific statements that they allege were (or became) false in light of NASDAQ's alleged system problems," and that these statements were plead "in order to demonstrate that Defendants had a duty to correct or update." (Def. Br. at 7.) According to Defendants, *Affiliated Ute* is therefore inappropriate because *Wilson v. Comtech Telecomm. Corp.,* 648 F.2d 88, 93 (2d Cir.1981) holds that a when a duty arises from prior affirmative statements that become misleading in the absence of omitted information, *Affiliated Ute* does not apply. (*Id.* ("In short, a duty to update or correct and the *Affiliated Ute* presumption are mutually exclusive.").)

Recognizing precedent to the contrary, Defendants maintain that to the extent *In re Smith Barney Transfer Agent Litigation,* 290 F.R.D. 42, 48 (S.D.N.Y.2013) (applying the *Affiliated Ute* presumption based on a duty to disclose) and other district case law can be read to suggest that the *Affiliated Ute* presumption *may* apply in a duty to correct case, this only underscores the need for Second Circuit review.

*Wilson* creates no such limitation on the *Affiliated Ute* presumption, and does not establish any distinction between different types of omissions cases based upon how a defendant's duty arose. To the contrary, *Wilson* explicates the various contexts in which *Affiliated Ute* may be applied;

> To characterize this, for purposes of establishing reliance, as either an omission or a misrepresentation case is to beg the question. In many instances, an omission to state a material fact relates back to an earlier statement, and if it is reasonable to think that that prior statement still stands, then the omission may also be termed a misrepresentation. The labels by themselves, therefore, are of little help. What is important is to understand the rationale for a presumption of causation in fact in cases like *Affiliated Ute,* in which no positive statements exist: reliance as a practical matter is impossible to prove.

*Wilson,* 648 F.2d at 93 (citing 3 A. Bromberg & L. Lowenfels, Securities Fraud & Commodities Fraud s 8.6(1), at 209 ("In nondisclosure cases, reliance has little if any rational role"); Note, The Reliance Requirement in Private Actions Under SEC Rule 10b–5, 88 Harv.L.Rev. 584, 590 (1975)). Applying the applicable law to the

facts presented, the court in *Wilson* determined that plaintiffs' claims arose primarily from defendants' initial statements, and not on any independent omissions. *Wilson,* 648 F.2d at 93–94. Because the fully developed record following trial showed, and plaintiffs acknowledged, that plaintiffs did not rely on the initial statements underlying the claim, the court determined that the presumption of reliance did not apply. *Id.*

Such facts are distinguishable where, as here, Plaintiffs' securities claims are grounded primarily in material omissions, and not on the former positive statements. Further, though the record is undeveloped, Plaintiffs specifically allege in their CAC reliance on "the integrity of NASDAQ's technology and trading platforms, including its IPO Cross system, as represented by Defendants in NASDAQ's SEC filings, press conference, analyst conference calls and conferences, press releases, public statements, and other publications disseminated by and/or concerning NASDAQ." (CAC ¶¶ 189, 337.)

Defendants acknowledge that, aside from *Wilson,* courts in this district have held that the *Affiliated Ute* presumption of reliance is appropriate where, as here, a defendant's material omission arose from a duty to update and/or correct prior representations. *See In re Beacon Assocs. Litig.,* 745 F.Supp.2d 386, 412–13 (S.D.N.Y. 2010) (holding that where a defendant "was under a duty to update or correct [a prior misrepresentation] ... Plaintiffs are entitled to the *Affiliated Ute* presumption of reliance on this omission"); *see also Levitt v. J.P. Morgan Securities, Inc.,* 710 F.3d 454, 465 (2d Cir.2013) [6] (citing *Affili-*

---

**6.** Defendants maintain that *Levitt v. J.P. Morgan Securities, Inc.,* 710 F.3d 454, 465 (2d Cir.2013) is inapplicable because there, the Second Circuit reversed a district court for

improperly invoking the *Affiliated Ute* presumption. (Reply Br. at 10.) *Levitt* did reverse the district court, but because no "duty" had been established such that a duty to dis-

*ated Ute*, 406 U.S. at 153–54, 92 S.Ct. 1456) (affirming that "an omission of a material fact by a defendant with a duty to disclose establishes a rebuttable presumption of reliance upon the omission by investors to whom the duty was owed."); *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 159, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008) (same). In *In re Parmalat Sec. Litig.*, 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008) the defendants, similar to NASDAQ, maintained that "the *Affiliated Ute* presumption d[id] not apply" because affirmative misrepresentations existed, and as such the case was not one "involving primarily a failure to disclose." *Id.* at *8. The court in *In re Parmalat* clarified that,

> [D]efendants overstate the limitations of the applicability of the *Affiliated Ute* presumption. While it is not available where the omissions served only to "exacerbate[ ] the misleading nature of the affirmative statements," it does apply where the alleged omissions played an independent, or at least interdependent, role in the alleged fraud. *See, e.g., Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 186–87 & nn. 85, 87 (S.D.N.Y.2005); *WorldCom*, 219 F.R.D. 267, 298 (S.D.N.Y.2003) ("While the omissions and misrepresentations are alleged to be interdependent in their significance and effect, it remains true that the description of the relationship at issue here was omitted from the analyst reports, that the description of World-Com's financial condition was not a de-

scription of the relationship, and that reliance on material omissions is presumed.").

*Id.*

Applying these established principles, because the CAC specifies that the "federal securities allegations are based not on Defendants' pre-Class Period statements, ... but on the material omissions concerning NASDAQ's known system problems," and that the "affirmative statements are identified [independently] in order to demonstrate that Defendants had a duty to correct," the December 16 Opinion determined that the federal securities claim involved "primarily a failure to disclose," and reliance could be presumed under the *Affiliated Ute* doctrine. (December 16 Opinion at 469 (citing *Wilson*, 648 F.2d at 93 (presumption of reliance applies where the complaint does not "rest[ ] primarily on affirmative statements" but on material omissions, upon which "reliance as a practical matter is impossible to prove"); *Smith Barney*, 290 F.R.D. at 47 (same)).) [7]

Aside from their incorrect application of *Wilson*, Defendants offer no other basis or cited precedent for why the Court's application was incorrect, or why any doubt exists as to the appropriate legal standard. What is left are intellectually challenging issues arising in a difficult and complex litigation, but not a situation warranting certification of an interlocutory appeal under § 1292(b). *See German*, 896 F.Supp. at 1398 (certification "is not intended as a vehicle to provide early review of difficult

---

close existed. 710 F.3d at 465. *Levitt*'s articulation of the reliance principle, as cited, is in no way lessened because in that particular case the facts failed to establish a duty to disclose.

**7.** Nor does Defendants' cited Fifth Circuit precedent, *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1119 (5th Cir.1988), stating that the *Affiliated Ute* presumption should be invoked

in cases where "the complaint is grounded primarily in allegations that the defendant has failed to disclose any information whatsoever" prove inconsistent with the December 16 Opinion, in which Plaintiffs' allegations supporting the presumption of reliance are related not to Defendants' prior statements, but "primarily" to their omissions regarding the system failures. *Id.*

rulings in hard cases"); *see also Ntsebeza v. Daimler A.G. (In re South African Apartheid Litig.)*, 624 F.Supp.2d 336, 339 (S.D.N.Y.2009) ("Interlocutory appeal is ... not intended as a vehicle to provide early review of difficult rulings in hard cases.").

Because Defendants fail to show any unsettled or inconsistent application of law with respect to either challenged issue, Defendants' disagreement with the Court's application of established precedent to the facts presented is insufficient to show any substantial basis for a difference of opinion or to justify § 1292(b) relief. *See Wausau Bus. Ins. Co. v. Turner Constr. Co.*, 151 F.Supp.2d 488, 491 (S.D.N.Y.2001) ("A mere claim that the district court's ruling was incorrect does not demonstrate a substantial ground for a difference of opinion.").

*Conclusion*

Based upon the conclusions set forth above, Defendants' motion for interlocutory appeal is denied.

It is so ordered.